# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | |
|---|---|
| **DERRICK O'NEAL MASON,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **vs.** | )**Case no.  5:05-CV-1932-VEH-PWG** |
| | ) |
| **DONAL CAMPBELL, Commissioner,** | ) |
| **Alabama Dept. of Corrections,** | ) |
| | ) |
| **Respondent.** | ) |

---

## MEMORANDUM OPINION

This action seeks habeas corpus relief with respect to petitioner Derrick O'Neal Mason's ("Mason") state court conviction and death sentence on a charge of capital murder.  (*See* 28 U.S.C. § 2254).

## I. THE OFFENSE

The following summary of the evidence relevant to the offense is taken from opinion of Alabama Court of Criminal Appeals on direct appeal.  *Mason v. State*, 768 So.2d 981, 983-87 (Ala. Crim. App.  1993).

> At the time of her death, 25-year-old Angela Cagle was working as a clerk in a Majik Mart convenience store in Huntsville.  Around 2:30 a.m. on Sunday, March 27, 1994, Don Teal, a newspaper delivery man, entered the south door of the Majik Mart to deliver a stack of newspapers.  He spoke briefly with Angela Cagle and a customer who was in the store.
>
> Around 3:30 a.m., DeAnna Lechman stopped by a nearby Circle K convenience store to purchase some cigarettes.  Circle K did not have the brand that Lechman wanted, so she went to the Majik Mart.  Lechman entered through the north door of the store because the south door was locked.  As she entered the store, she

1

noticed a sign on the door that read, "This door locked.  Use other door."  (R. 825.)
Lechman did not see anyone in the store, so she assumed that the clerk was in the
back.  She called out for the clerk.  When Lechman approached the back of the store,
she observed the partially nude body of Angela Cagle, lying in the storeroom.

Lechman went to the counter and telephoned for help.  While she was talking
with the police dispatcher, she noticed that the "gas pump machine" was beeping and
that it reflected an amount of $5.00 in the display.  The cash register was also
emitting a continuous tone.  In order to hear the dispatcher, Lechman turned off the
gas pump machine.  She tried unsuccessfully to turn off the cash register.

Within a few minutes, the police arrived at the scene.  Paul Hatfield, a patrol
officer with the Huntsville Police Department, was one of the first officers to arrive.
When Hatfield entered the storeroom, he found the partially nude body of Angela
Cagle-she was wearing only her socks-lying across a desk.  Cagle was lying on her
left side, and she appeared to have suffered a gunshot wound to the right side of her
face.  Cagle had no visible signs of life.

Cagle's clothing was found near the desk.  A bullet was recovered from the
west wall in the area above Cagle's hips.  A second bullet was found on some shelves
located directly north of the victim's head.  A shell casing was discovered in the
book-shelves, and another casing was found on the floor in the area near Cagle's
body.  When the coroner removed Cagle's body, a second bullet wound was found
on the victim's left cheek.  Black buttons were found in the area near Cagle's body.
Another button was later found stuck to the victim's chest.  A negroid pubic hair,
consistent with a known pubic hair from the appellant, was found in the combings
from Cagle's pubic hair.  In addition, cloth fibers that did not match Cagle's clothing
were found on her left inner thigh and calf.

Susan Marcum, who was at that time the manager of the Majik Mart, had
spoken with Angela Cagle several times by telephone that night, the last time being
around 2:00 a.m.  Marcum was summoned to the store around 4:00 a.m.  She was
able to determine that the last sale occurred at 2:58 a.m., and that no money was
missing from the store and that no gasoline had been stolen.  Marcum testified that
the only way to make the cash register emit the tone heard at the scene was to hit an
incorrect button on the register.

Harry Renfroe, Jr., a homicide investigator with the Huntsville Police
Department, assisted in the investigation.  On March 28, 1994, he was contacted by
Dewey Miller, the police officer who was securing the crime scene.  Miller informed
Renfroe that a black male had approached him at the scene and had asked what type
of gun was involved in the incident.  Miller told the individual that he did not know.
The individual told Miller where he could be reached.  Miller conveyed this

information to Renfroe. When Renfroe telephoned the individual, the man asked Renfroe what type of weapon was used in the incident. Renfroe asked the individual what type of weapon he was interested in and the man replied a ".380." (R. 1154.) The individual declined to meet with Renfroe that day. When the man telephoned Renfroe the next day, Renfroe asked him what type of .380 had been used in the shooting. The individual indicated that he was not sure. At that time, Renfroe was aware that forensic tests performed on the bullets recovered from the scene indicated that the weapon used was most likely a Davis .380. The man subsequently telephoned Renfroe and told him that the weapon was a Davis .380.

Renfroe agreed to meet with the individual at a local fast-food restaurant that afternoon. During their meeting, the man gave Renfroe the appellant's name. When Renfroe asked the individual why he thought the appellant was involved, the individual replied that the appellant had a .380 pistol and that the appellant was trying to make a name for himself. He told Renfroe that the appellant "was out of control." (R. 1157.) Renfroe returned to his office and informed the other investigators of the information that he had received. The investigators were able to obtain a physical description of the appellant, his address, and a description of his vehicle.[FN1] Renfroe subsequently spoke with the individual who had furnished him the appellant's name, and the man said that the appellant would most likely be at a certain apartment complex that afternoon or later that evening. A "be-on-the-lookout" was issued for the appellant.

> FN1. Testimony elicited in the suppression hearing indicated that the officers discovered that there was an outstanding warrant for the appellant's arrest for third-degree assault. This information was not provided to the jury.

That night, James Goings, a member of the Huntsville Police Department special response team, and another officer spotted the appellant's vehicle. Goings stopped the appellant's vehicle after it entered the drive-through lane of a fast-food restaurant. Two officers in another vehicle followed Goings's vehicle into the parking lot. The appellant cooperated with the officers when he was ordered out of the vehicle and placed under arrest. The appellant was subsequently transported to the criminal investigation division of the police department (CID).

Lisa Hamilton, an evidence technician with the Huntsville Police Department, assisted by Officer Dwight Hasty, performed an inventory search of the appellant's vehicle. A Davis .380 pistol, which was wrapped in a shirt, and a clip containing five rounds of ammunition were found in the appellant's vehicle.

3

That night, Hamilton transported the weapon and the clip to Brent Wheeler, a firearms expert with the Alabama Department of Forensic Sciences. Ballistics tests indicated that the bullets found at the crime scene had been fired through the weapon recovered from the appellant's vehicle.

Harry Renfroe, one of the investigators, first spoke with the appellant when the appellant was brought into the interview room at CID on the night of March 29, 1994. After being apprised of his rights, the appellant waived his rights and talked with Renfroe. In response to Renfroe's questions, the appellant admitted that he had a Davis .380 weapon in his truck. He told Renfroe that he had borrowed the weapon the previous Thursday from an individual named "Barrington." The appellant told Renfroe that the gun had not been out of his possession since that time, and that it had been fired twice. When Renfroe inquired about the appellant's whereabouts on the night of the murder, the appellant told him that he had fallen asleep on the couch at his girlfriend's apartment, while watching television. During the course of the interview, Renfroe was informed that ballistics tests indicated that the gun found in the appellant's truck was the murder weapon. When Renfroe confronted the appellant with this fact, the appellant continued to deny any involvement in the murder. Renfroe left the interview room.

The appellant subsequently asked everyone but James (Bud) Parker, an investigator with the Huntsville Police Department, to leave the room, and then he confessed to Parker that he killed Angela Cagle. Parker testified as follows regarding the statement:

"I identified myself, and at 016 hours on 3/30/94 I advised him of his rights. He said he understood and would tell me what happened.

"I first asked him if his name was Derrick O'Neal Mason, date of birth 8/9/74. He said, 'Yes, sir.' I asked him if he shot the victim. He said, 'Yes sir.' I asked him why he went into the store. And he said, 'To rob it.' I asked him why he shot the victim. He said, 'I just did it. It just happened.' I asked him what time he went into the store. He said, 'It was late.'

"During the course of the interview the suspect stated he went in the door on the side near the Circle K, which would have been the south door. The victim was from behind-from behind the counter working on a shelf with the merchandise. He had the gun out and was trying to cover his face with his arm. He told her to lock the door, which she did. And she took the key over to the other door and left it in the key hole. He told her to unlock the cash register and to

4

give him the money.  She said she could not until the next transaction.  He told her to go to the back and to unplug the camera.  She went to the back and he went behind her.  He kept telling her to unplug the camera, and she said there was no camera in the store.  He then said, 'I did not want to go back out front with the camera on.'  He said, 'She kept saying there was no camera in the store.'  He did not believe her because he thought all stores had cameras.  He told her, 'If you don't unplug the camera, I will be forced to shoot you,' he said.  'I had put a bullet in the chamber earlier and was just going to shoot.'  He said, 'I had the safety on.'  I asked him if the clip was in the gun, and he said, 'Yes.'  I asked him if it was loaded, and he said, 'Yes.'  He then said, 'I thought I was going to get carjacked earlier.'  He then said, 'I kept telling her to unplug the camera, and she kept saying they did not have a camera, and I did not believe her.'  She said, 'Let me go get you the money,' and I thought she was going to push some button.  The victim started walking and he grabbed her by the shoulder and her jacket and shirt ripped.  He heard the buttons fly off.

"He then said, 'I saw her private area.'  He said, 'She was crying and I got real nervous.'  He then told her, 'If you don't unplug the camera, I will make you take all your clothes off.'  He looked outside to see if any car had stopped for gas.  He told her to take all her clothes off, which she did.  He told her, 'Now unplug the camera and show me how to open the cash register.'

"He then said, 'I was high.'  I asked him what he was on.  He said, 'Marijuana.'  He then said he heard what he thought was a car.  He said, 'She was sort of standing in the floor in front of the desk and she came at me.'  He again said, 'I was high and the gun went off and I shot her.'  He said, 'It scared me....'  He then said, 'I looked and saw her leg move and I did not want her to identify me.'  He said, 'I turned my head and put the gun down there and shot her the second time.'

"I asked him how far away he was when he shot her, and he said, 'About from me to you,' which was three to four feet.  I asked him if he aimed the gun for her face, and he said, 'I just saw her shoulder.  I thought I shot her in the chest.'  I asked him why he shot her the second time, and he said, 'I did not want her to identify me; I just did it.'

"I then asked him where he went after the shooting.  He said, 'I went up the street to the Executive Lodge and parked for about 10 minutes and tried to think, to cope with what I had done.'  I asked him what he took out of the store, and he said, 'Nothing.'  I asked him which door he went out as he was leaving the store.  He said, 'The other door,' which would have been the north door.  I then asked him if he raped the victim, and he said, 'No.'  I asked him if he touched her in any way with his hands.  He said, 'Nothing sexually.'  I asked him where he went when he left the Executive Lodge Apartments, and he said, 'I went home and then went to my girlfriend's.'

"I asked him if his girlfriend knew what happened, and he said, 'No.'  I asked him if anyone knew, and he said, 'I tried to tell my brother to get it off my chest, but I did not.'  I asked him who owned the gun, and he said, 'Barrington.'  I asked him if anyone else was with him, and he said, 'No.'  I asked him how long he stayed in the store, and he said, 'About 10 minutes.'

"I then asked him why he did that.  He said, 'I was robbing the store to get the money to open a barber shop.'  I then asked him how he was dressed that night.  He said, 'The jeans and shoes that I have on and a purple shirt, which is at my girlfriend's house.'  I then asked him if he knew the victim.  He said, 'I have never seen her before.'  I then asked him if she was sitting up on the desk when the first shot was fired, and he said, 'Her feet-her feet [were] on the floor,' and he thought she was going to come at him.  He said he shot and thought he hit her in the chest.  He then said, 'Fuck, if she lives, that will be a witness.  I held the gun over her and pulled the trigger, turning my head.'

"I asked him what he was driving that night, and he said his mother's blue Oldsmobile and had it parked at Warren House Apartments and had walked to the store.  I then asked him if he pumped some gas in his car before he shot the victim, and he then said, 'I did get $2 in gas about 30 minutes before it happened.'  I asked him if he got it at that store, and he said, 'Yes.  I just rode around.'  I then told him to tell me the truth and asked if he pumped $5 in gas from the north pump, and he said, 'No.'

"I then asked him how he knew the victim was by herself.  He said, 'I parked at Warren House behind the Circle K, I walked down the hill behind the store, I looked inside from up on the hill, I then went back and got my car and pulled out on Sparkman and turned

6

into the parking lot on the north side of the building.'  I again asked if he parked at the gas pumps, and he said, 'No, I parked at the door which was locked.'  I asked him if he had anything else he wanted to tell me, and he said, 'No, I can't think of anything else.'

"....

"... I then told him there was one other thing I needed to know, and I asked him if he tried to open the cash register.  And he said, 'Yes, I pushed some buttons and it started beeping and I went out the door.' "

(R. 1250-56.)

Barrington Loyd Dames, a student at Oakwood College at the time of the murder, testified that he was an acquaintance of the appellant's.  Dames loaned the Davis .380 pistol to the appellant on two occasions.  He first loaned the appellant the gun approximately a week and a half before the murder.  The appellant returned the gun to Dames two days later.  Dames again loaned the appellant the pistol on the Thursday before Angela Cagle was murdered.  Dames saw the appellant approximately two days after Cagle was murdered.  The appellant told Dames that he still had the gun.  The appellant did not return the gun to Dames.

Dr. Joseph Embry, a forensic pathologist for the Alabama Department of Forensic Sciences, performed the autopsy on Angela Cagle.  He testified that the victim had several bruises on her body.  Embry testified that the bruises to Cagle's left thigh, right knee, left arm, and buttocks appeared to be recent.  Embry testified that Cagle had two bruises on her head, which appeared to have been inflicted by the same instrument.  Dr. Embry testified that the victim had suffered two gunshot wounds to her head.  The gunshot wound to the right side of Cagle's head passed through her brain stem, killing her instantly.

*Mason v. State*, 768 So.2d 981, 983-87 (Ala. Crim. App. 1998).

## II.  <u>PROCEDURAL HISTORY</u>

On June 16, 1995, Mason was found guilty of capital murder during the course of a robbery or an attempt thereof, in violation of § 13A-5-40 (a)(2), *Code of Alabama*, 1975.  A penalty hearing immediately followed and the jury, by a vote of 10-2, recommended that he be sentenced to death.

7

A formal sentencing hearing as required by Alabama Code § 13A-5-47 (1975) was conducted, and on August 14, 1995, the trial court judge sentenced Mason to death. An automatic notice of appeal was filed the same day.

On August 23, 1995, Mason's trial counsel, Randy and Jackie Ferguson, filed a motion to withdraw. (C.R. Vol. 1, Tab. 1 at 265-66). The motion was granted, whereupon attorneys Reid Webster and Bruce Gardner were appointed to represent Mason. (*Id.* at 267). On November 2, 1995, Webster and Gardner timely[1] filed a motion to set aside the verdict and motion for new trial. (C.R. Vol. 11 at 1-3). In it, counsel raised several substantive and ineffective assistance of trial counsel claims. (*Id.*). The motion was set for hearing on February 9, 1996. (*Id.*, Tab. 33 at 1-63). At the motion for new trial, Mason's counsel presented no witnesses, and matters were argued from the record. (*Id.*). On February 20, 1996, the trial court entered an order in which it asserted that it had

> carefully considered the Motion, and all grounds asserted therein, arguments of counsel, and the transcript of all prior proceedings (which, at the request of the Defendant, is hereby incorporated by reference in its entirety as an exhibit to this hearing.)
>
> The Court has also reviewed again, and considered, all Motions filed and or made by the Defendant in pre-trial and trial proceedings, including any Motions for a mistrial, which were denied by the Court, and which were renewed at this hearing. The Court hereby again **DENIES** those Motions.
>
> After review and consideration of the above, the Court is of the opinion that the Defendant's Motion For a New Trial should be, and the same is hereby **DENIED**.

(*Id.*).

---

[1]   Additional time to file the motion was requested and granted due to counsels' need to obtain and review transcripts of the trial court proceedings.

8

Mason appealed his conviction and sentence to the Alabama Court of Criminal Appeals. Mason raised nine (9) issues on direct appeal.  (C.R. Vol. 12, Tab. 34 at 3-4).  On March 6, 1998, the appellate court entered a published opinion affirming Mason's conviction and death sentence. *See Mason v. State*, 768 So.2d 981 (Ala. Crim. App. 1998).

The Supreme Court of Alabama affirmed the conviction and sentence on April 7, 2000, finding no reversible error, plain or otherwise.  *See Ex Parte Mason*, 768 So.2d 1008 (Ala. 2000).

The United States Supreme Court denied Mason's petition for writ of *certiorari* on November 13, 2000.  *See Mason v. Alabama*, 531 U.S. 994 (2000).

Mason then filed a petition for relief from judgment pursuant to Rule 32 of the ALABAMA RULES OF CRIMINAL PROCEDURE  [ALA. R. CRIM. P.] on October 17, 2001.  (Rule 32 C.R. Vol. 12, Tab. 41 at 1-34).  The State filed an answer and supporting brief.  (*Id.*, Tab. 42 at 1-60 and Tab. 43 at 1-10).  Mason responded to the State's answer.  (*Id.*, Tab. 44 at 1-8).

The circuit court again denied the Rule 32 petition on July 7, 2005.[2]  (Rule 32 C.R. Vol. 16, Tab. 55 at 1-64).  Pursuant to ALA. R. CRIM. P. 32.10, Mason could "appeal the decision of a circuit court according the procedures of the Alabama Rules of Appellate Procedure to the Court of Criminal Appeals upon taking a timely appeal as provided in Rule 4, Alabama Rules of Appellate Procedure [ARAP]."  Rule 4(a) of the ARAP instructs that the notice of appeal "shall be filed with the clerk of court be taken within 42 days (6 weeks) of the date of entry of judgment or order

---

[2]    Actually, the circuit court denied the petition on August 6, 2004, but due to clerical error, the parties were not informed of the dismissal until April 25, 2005.  *See* (Rule 32 C.R. Vol. 15, Tab. 45, Exhibits A & B).  At the circuit court's suggestion, Mason filed a petition for Writ of Mandamus requesting permission to file an out of time appeal.  *Id.* at Tab. 45, pp. 1-7.  The State stipulated to the facts underlying Mason's petition for writ of mandamus.  *Id.* at Tab. 46.  On June 29, 2005, the Alabama Court of Criminal Appeals granted the writ, directed the circuit judge to set aside its order dismissing the Rule 32 petition, reissue the order and notify Mason so that a timely appeal could be filed.  *See* (Rule 32 C.R. Vol. 16, Tab. 54).

appealed from[.]"  Thus, Mason was required to filed a notice of appeal from the denial of the Rule 32 petition on or before August 18, 2005.  However, Mason did not file the notice of appeal until August 22, 2005.  (Rule 32 C.R. Vol. 15, Tab. 46).

On September 8, 2005, the Alabama Court of Criminal Appeals dismissed Mason's appeal as untimely filed.  *Mason v. State*, Memorandum Opinion, CR-04-2394, ___ So.2d ___ (Ala. Crim. App. 2005).  (*Id.* at Vol. 16, Tab. 56).

The Supreme Court of Alabama denied certiorari review on August 8, 2005.

On September 13, 2005, Mason filed the present Habeas Petition (the "Petition") in this court.

## III.  THE SCOPE OF FEDERAL HABEAS REVIEW

Pursuant to 28 U.S.C. § 2254(a), a federal district court is prohibited from entertaining a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court . . ." unless the petitioner alleges "he is in custody in violation of the Constitution or laws or treaties of the United States."  In other words, this court's review of habeas claims is limited to federal constitutional questions.  Claims pertaining solely to questions of state law fall outside the parameters of this court's authority to provide relief under § 2254.  Thus, unless otherwise expressly stated, use of the word 'claim' in this opinion presupposes a claim of federal constitutional proportion.

### A.    Exhaustion and Procedural Default

Prior to seeking relief in federal court from a state court conviction and sentence, a habeas petitioner is first required to present his federal claims to the state court by exhausting all of the state's available procedures.  The purpose of this requirement is to ensure that state courts are

afforded the first opportunity to correct federal questions affecting the validity of state court convictions.  As explained by the Eleventh Circuit:

> In general, a federal court may not grant habeas corpus relief to a state prisoner who has not exhausted his available state remedies.  28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . .").  "When the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction. . . . The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited.  Federal courts are not forums in which to relitigate state trials."  *Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887(1983)).

> Exhaustion of state remedies requires that the state prisoner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (citing *Picard v. Connor*, 404 U.S. 270, 275-76 (1971) (internal quotation marks omitted).  The Supreme Court has written these words:

>> [T]hat the federal claim must be fairly presented to the state courts . . . . it is not sufficient merely that the federal habeas applicant has been through the state courts. . . .  Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies.

> *Picard*, 404 U.S. at 275, 92 S.Ct. at 512.  *See also Duncan*, 513 U.S. at 365, 115 S.Ct. at 888 ("Respondent did not apprise the state court of his claim that the evidentiary ruling of which he complained was not only a violation of state law, but denied him the due process of law guaranteed by the Fourteenth Amendment.").

> Thus, to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues.  "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made."  *Anderson v. Harless*, 459 U.S. 4, 5-6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982) (citations omitted).

*Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998).

11

Moreover, if a petitioner fails to raise his federal claim to the state court at the time and in the manner dictated by the state's procedural rules, the state court can decide the claim is not entitled to a review on the merits, *i.e.,* the claim is procedurally defaulted.  Usually, if the last state court to examine a claim explicitly finds that the claim is defaulted because the petitioner failed to follow state procedural rules, then federal review of the claim is also precluded pursuant to federal procedural default principles.  As explained by the Eleventh Circuit:

> The federal courts' authority to review state court criminal convictions pursuant to writs of habeas corpus is severely restricted when a petitioner has failed to follow applicable state procedural rules in raising a claim, that is, where the claim is procedurally defaulted.  Federal review of a petitioner's claim is barred by the procedural default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar, *Harris v. Reed*, 489 U.S. 255, 263, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989), and that bar provides an adequate and independent state ground for denying relief.  *See id.* at 262, 109 S.Ct. at 1042-43; *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S.Ct. 1981, 1987, 100 L.Ed.2d 575 (1988).  The doctrine serves to ensure petitioners will first seek relief in accordance with state procedures, *see Presnell v. Kemp*, 835 F.2d 1567, 1578-79 (11th Cir. 1988), *cert. denied*, 488 U.S. 1050, 109 S.Ct. 882, 102 L.Ed.2d 1004 (1989), and to "lessen the injury to a State that results through reexamination of a state conviction on a ground that a State did not have the opportunity to address at a prior, appropriate time." *McCleskey v. Zant*, 499 U.S. 467, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991).

*Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991).  Federal deference to a state court's clear finding of procedural default under its own rules is so strong that a:

> "state court need not fear reaching the merits of a federal claim in an *alternative* holding.  Through its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law." *Harris*, 489 U.S. at 264 n. 10, 109 S.Ct. 1038 (emphasis in original).  *See also Alderman v. Zant*, 22 F.3d 1541, 1549-51 (11th Cir. (where a Georgia habeas corpus court found that the petitioner's claims were procedurally barred as successive, but also noted that the claims lack merit based on the evidence, "this ruling in the alternative did not have an effect . . . of blurring the clear determination by the

[Georgia habeas corpus] court that the allegations was procedurally barred"), *cert. denied*, 513 U.S. 1061, 115 S.Ct. 673, 130 L.Ed.2d 606 (1994).

*Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999).

The Supreme Court defines an "adequate and independent" state court decision as one "'[which] rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment.'"  *Lee v. Kemna,* 534 U.S. 362, 375 (U.S. 2002) (quoting *Coleman v. Thompson,* 501 U.S. 722, 729 (1991) (emphases added)).  Whether or not a state procedural rule is "adequate and independent" so as to have a preclusive effect on federal review of a claim "'is itself a federal question.'" (*Id.*)  (quoting *Douglas v. Alabama*, 380 U.S. 415, 422 (1965).

A state procedural rule is "independent of the federal question" when it "rests solidly on state law grounds [that are] not intertwined with an interpretation of federal law." *Judd v. Haley,* 250 F.3d 1308, 1313 (11th Cir. 2001) (quoting *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)).  To be considered "adequate" by a federal court, the state procedural rule must be both "'firmly established and regularly followed.'"  *Lee v. Kemna,* 534 U.S. at 375 (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984).  In other words, the rule must be "clear [and] closely hewn to" by the state for a federal court to find it to be adequate. *James v. Kentucky*, 466 U.S. at 345.  This does not mean that the procedural rule must be applied rigidly in every instance, or that occasional failure to do so eliminates its "adequacy."  Rather, the "adequacy" requirement means only that the procedural rule "must not be applied in an arbitrary or unprecedented fashion." *Judd v. Haley,* 250 F.3d at 1313.  If it is adequate, then the federal court normally will foreclose its review.  If however, the rule is not firmly established, or if it is applied in an arbitrary, unprecedented, and manifestly unfair fashion, it is not adequate to preclude federal review.  *Card v. Dugger*, 911 F.2d at 1517.

13

Of course, there are also instances where the doctrines of procedural default and exhaustion intertwine.  For instance, if a petitioner's federal claim is unexhausted, the district court will traditionally dismiss it without prejudice or stay the cause of action in order to allow the petitioner to first avail himself of his state remedies.  However, "if it is clear from state law that any future attempts at exhaustion [in state court] would be futile [under the state's own procedural rules,]" this court can simply find that the claim is "procedurally defaulted, even absent a state court determination to that effect[.]" *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (citing *Picard v. Connor,* 404 U.S. 270, 276 (1971) and *Snowden v. Singletary*, 135 F.3d 732, 737 (11th Cir. 1998)).

There are only three circumstances in which an otherwise valid state-law ground will not bar a federal habeas court from considering a constitutional claim that was procedurally defaulted in state court: (1) where the petitioner had good "cause" for not following the state procedural rule and was actually "prejudiced" by not having done so; (2) where the state procedural rule was not "firmly established and regularly followed"; and (3) where failure to consider the petitioner's claims will result in a "fundamental miscarriage of justice."  *See Edwards v. Carpenter*, 529 U.S. 446, 455 (2000) (Breyer, J., concurring); *see also*, *e.g.*, *Coleman v. Thompson*, 501 U.S. at 749-50 (holding that a state procedural default "will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice") (citations and internal quotation marks omitted); *Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural

14

default."); *Smith v. Murray*, 477 U.S. 527, 537 (1986) (same); *Davis v. Terry*, 465 F.3d 1249, 1252 n. 4 (11th Cir. 2006) ("It would be considered a fundamental miscarriage of justice if 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'") (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (in turn quoting *Murray v. Carrier*, 477 U.S. at 496)).

## B.      The "Cause and Prejudice" Standard

As the "cause *and* prejudice" standard clearly is framed in the conjunctive, a petitioner must prove both parts.  To show cause, a petitioner must prove that "some objective factor external to the defense impeded counsel's efforts" to raise the claim previously.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

> Objective factors that constitute cause include "'interference by officials'" that makes compliance with the State's procedural rule impracticable, and "a showing that the factual or legal basis for a claim was not reasonably available to counsel." *Ibid*.  In addition, constitutionally "[i]neffective assistance of counsel . . . is cause." *Ibid*. Attorney error short of ineffective assistance of counsel, however, does not constitute cause and will not excuse a procedural default.  *Id.*, at 486-488, 106 S. Ct., at 2644-45.

*McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991).  *See also Murray v. Carrier*, 477 U.S. at 488-89 ("Ineffective assistance of counsel . . . is cause for a procedural default."); *Reed v. Ross*, 468 U.S. 1, 16 (1984) ("[W]here a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures.").

Once cause is proved, a habeas petitioner also must prove prejudice.  Such a showing must go beyond proof "that the errors at his trial created a *possibility* of prejudice, but that they worked

to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

## C.     The "Fundamental Miscarriage of Justice" Standard

In a "rare," "extraordinary,"[3] and "narrow class of cases,"[4] a federal court may consider a procedurally defaulted claim in the absence of a showing of "cause" for the procedural default, if (1) a "fundamental miscarriage of justice" has "probably resulted in the conviction of one who is actually innocent," *Smith v. Murray*, 477 U.S. 527, 537-38 (1986) (quoting, respectively, *Engle v. Isaac*, 456 U.S. 107, 135 (1982), and *Murray v. Carrier*, 477 U.S. at 496)[5], or if (2) the petitioner shows "by clear and convincing evidence that[,] but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, 323-27 & n.44 (1995) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)); *see also, e.g., Smith v. Murray*, 477 U.S. at 537-38.

Even when exhaustion and procedural default are not at issue, federal review of a claim that has been decided on the merits by a state court is fairly restricted.

---

[3]   *Schlup v. Delo*, 513 U.S. 298, 321 (1995) ("To ensure that the fundamental miscarriage of justice exception would remain 'rare' and would only be applied in the 'extraordinary case,' while at the same time ensuring that the exception would extend relief to those who were truly deserving, this Court explicitly tied the miscarriage of justice exception to the petitioner's innocence.").

[4]   *McCleskey v. Zant*, 499 U.S. 467, 494 (1991) ("Federal courts retain the authority to issue the writ of habeas corpus in a further, narrow class of cases despite a petitioner's failure to show cause for a procedural default. These are extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime. We have described this class of cases as implicating a fundamental miscarriage of justice.") (citing *Murray v. Carrier*, 477 U.S. 478, 485 (1986)).

[5]   Specifically, the *Murray v. Carrier* Court observed that, "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." 477 U.S. at 496.

**D.      Rules Governing Habeas Corpus Cases Under § 2254**

**1.      28 U.S.C. § 2254(d) and (e)**

When it enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

Congress significantly limited the circumstances under which a habeas petitioner may obtain relief.

Indeed, under AEDPA, a petitioner is only entitled to relief on a federal claim if he shows that the

state court's adjudication of his claim "resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court,"

or that the court's rulings "resulted in a decision that was based on an unreasonable determination

of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)

and (2). *See also Williams v. Taylor*, 529 U.S. 362, 404 (2000); *Brown v. Payton*, 544 U.S. 133

(2005); *Miller-El v. Dretke*, 545 U.S. 231 (2005); *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir.

2001). "Moreover, a state court's factual determinations are presumed correct unless rebutted by

clear and convincing evidence." *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005) (citing

28 U.S.C. § 2254(e)(1)).

A state court's adjudication of a claim will be sustained under § 2254(d)(1) unless it is

"contrary to" clearly established, controlling Supreme Court precedent, or it is an "unreasonable

application" of that law. These are two different inquiries, not to be confused or conflated, as the

Supreme Court explained in *Williams v. Taylor*, 529 U.S. 362 (2000), saying:

> Section 2254(d)(1) defines two categories of cases in which a state prisoner may
> obtain federal habeas relief with respect to a claim adjudicated on the merits in state
> court. Under the statute, a federal court may grant a writ of habeas corpus if the
> relevant state-court decision was either (1) "*contrary to* ... clearly established Federal
> law, as determined by the Supreme Court of the United States," or (2) "*involved an
> unreasonable application of* ... clearly established Federal law, as determined by the
> Supreme Court of the United States." (Emphases added.)

*Williams,* 529 U.S. at 404.  The statute limits the source from which "clearly established Federal law" can be drawn to "holdings, as opposed to the dicta, of the [Supreme] Court's decisions as of the time of the relevant state-court decision."  *Id.* at 412; *see Jones v. Jamrog*, 414 F.3d 585 (6th Cir. 2005); *Sevencan v. Herbert*, 342 F.3d 69 (2nd Cir. 2003); *Warren v. Kyler*, 422 F.3d 132, 138 (3rd Cir. 2005) ("[W]e do not consider those holdings as they exist today, but rather as they existed as of the time of the relevant state-court decision.") (internal quotation marks and citation omitted).

A state-court determination can be "contrary to" clearly established Supreme Court precedent in either of two ways:

> First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Likewise, a state-court determination can be an "unreasonable application" of clearly established Supreme Court precedent in either of two ways:

> First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

(*Id.* at 407); *see also Putman v. Head*, 268 F.3d 1223 (11th Cir. 2001)).  Whether a particular application of Supreme Court precedent is "reasonable" turns not on subjective factors, but on whether the application of Supreme Court precedent at issue was "objectively unreasonable."  The

18

question is not whether the state court "correctly" decided the issue, but whether its determination was "reasonable," *even if incorrect*. *See Bell v. Cone*, 535 U.S. 685, 694 (2002).

Having explained the scope of this court's authority to review state court decisions, it is now appropriate to examine the federal procedural rules applicable to the controversy presently before the court.

### 2.      Procedural Rules Governing Habeas Corpus Cases Under § 2254

Since "habeas corpus review exists only to review errors of constitutional dimension," a habeas corpus petition must meet the "heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2c." *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (other citations omitted). A petitioner must specify all grounds for relief available to him, state the facts supporting each ground, and state the relief requested. 28 U.S.C. § 2254, Rule 2(c)(1)(2)(3) of the *Rules Governing Section 2254 Cases*. A "general reference to the transcripts, case records and briefs on appeal patently fails to comply with Rule 2(c)." *Phillips v. Dormire*, 2006 WL 744387, *1, No. 4:04CV1483 (E.D. Mo. 2006) (citing *Adams v. Armontrout*, 897 F.2d 332, 333 (8th Cir. 1990).

The burden of proof is on the habeas petitioner to establish a factual basis for the relief he seeks. *Hill v. Linahan*, 697 F.2d 1032, 1034 (11th Cir. 1983); *Corn v. Zant*, 708 F.2d 549, *reh'g denied*, 714 F.2d 159 (11th Cir. 1983). Consequently, a petitioner must provide substantial evidence to meet his burden of proof to show why federal post-conviction relief should be awarded. *Douglas v. Wainwright*, 714 F.2d 1532, *reh'g denied*, 719 F.2d 406 (11th Cir. 1983), *vacated on other grounds*, 468 U.S. 1206 (1984) and 468 U.S. 1212 (1984), *on remand* 739 F.2d 531 (11th Cir. 1984). That burden is to demonstrate at least *prima facie* evidence establishing the alleged constitutional violation. The mere assertion of a ground for relief, without more factual detail, does not satisfy

19

petitioner's burden of proof or the requirements of 28 U.S.C. § 2254(e)(2) and Rule 2(c), *Rules Governing § 2254 Cases in the United States District Courts*.

With these principles in mind, the court now turns to Mason's claims.

## IV.  THE CLAIMS

**A.     The prosecution's failure to develop and disclose information about the witness/accomplice's involvement in the crime violated petitioner's right to a fair trial.** (Doc. 17, ¶¶ 26-41 at 12-18).   *Brady v. Maryland*, 373 U.S. 83, 86 (1963) and *Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995).

In his petition, Mason alleges that the prosecution violated his constitutional right to a fundamentally fair trial by failing to investigate, discover and disclose to the defense that a witness/accomplice (who Mason identifies as Quincy) actually "planned the crime, persuaded [petitioner] to commit it, and provided [petitioner] hallucinatory drugs without [his] knowledge or consent just before [petitioner] committed the crime, resulting in [his] involuntary intoxication." (Doc. 17 at 16-17).[6]  Moreover, Mason claims the prosecution failed to disclose that Quincy was given a financial reward.  (*Id.* at 17-18).  Mason asserts that had evidence of his own involuntary intoxication and of Quincy's bias and monetary interests been disclosed, he would have been acquitted of the capital offense or sentenced to life-without-parole or found guilty of a non-capital offense.  (*Id.*).  Mason relies on *Brady v. Maryland*, 373 U.S. 83, 86 (1963) and *Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995), to support his argument that the alleged failures rendered his trial fundamentally unfair.  He now seeks "discovery of prosecution and institutional files, especially in

---

[6]     He asserts that, on the night of the murder, Quincy kept paging him and, since he liked hanging out with Quincy and wanted to keep a friendship, he went to Quincy's house and smoked some marijuana.  Unlike other times, the marijuana made him feel strange and hallucinatory.  He then writes, "Then Quincy gave me a gun and dared me to rob the 'Majik Mart' convenience store."  He then says he gave Quincy the gun back the night of the incident but that, on March 29, 1994, Quincy told him to come get the gun and get rid of it.  He picked it up and went to a fast food restaurant, where he was arrested in his car and the gun seized by police.  He asserts he looked across the street and saw Quincy and his friends, but just thought it was coincidence at the time.

light of the fact that [he] alleges that Quincy played a key role in the crime, including planning it, giving [him] the weapon, and intoxicating [him] without his knowledge or consent[.]" (Doc. 17 at 75).

This claim was raised for the first time in Mason's Rule 32 petition[7] and reads:

> The state elicited testimony from its witnesses and introduced evidence in violation of Mr. Mason's constitutional rights.  The state's improprieties included, but are not limited to:
> . . . .
> . . . .
>
> (c) Abdicating its duty to learn of any favorable evidence known to the police or others acting on the government's behalf, including information relating to the informant's role in the crime and the informant's possible bias[.][8]

The Rule 32 court summarily dismissed the claim, holding "these allegations are procedurally barred from review because they were raised or addressed at trial, could have been but were not raised at trial, were raised or addressed on appeal, or could have been but were not raised on appeal. Rules 32.2(a)(2),(3),(4), and (5) ARCrP.  Therefore, these allegations are summarily dismissed."[9] Mason's appeal from the rejection of the claim was dismissed (by the Alabama Court of Criminal Appeals) as untimely filed.[10]

---

[7]   (Rule 32 C.R. Vol. 14, Tab 41 at 22).

[8]   (*Id.*).  At this juncture, Mason inserted footnote 2, which reads: *See e.g.*, *Kyles v. Whitley*, 514 U.S. 419 (1994); *Florida v. J.L.*, 529 U.S. 266 (2000).

[9]   (Rule 32 C.R. Vol. 16, Tab 55 at 61).

[10]  *Mason v. State*, Memorandum Opinion, CR-04-2394, ___ So.2d ___ (Ala. Crim. App. 2005).  (Rule 32 C.R. Vol. 16, Tab 56).

Respondent answers that this claim is procedurally defaulted because the Alabama Court of Criminal Appeals dismissed Mason's collateral appeal as untimely. (Doc. 24 at 3). Respondent additionally argues that the claim was not fairly presented in Mason's Rule 32 petition and is, therefore, unexhausted and procedurally defaulted. (*Id.* at 4-5)(citing A.R.CRIM.P. 32.2 (b) and (c)). As a final addition, respondent argues the Rule 32 court correctly dismissed the claim as procedurally defaulted because Mason could have, but failed to, present it at trial or on direct appeal. (*Id.* at 5-6).

Mason's collateral appeal was clearly untimely and the state court's application of the adequate and independent state procedural rule to determine the untimeliness of the appeal presumptively renders this claim procedurally defaulted for federal review purposes. Alternatively, and assuming without deciding that the claim was fairly presented in the Rule 32 petition, the claim is procedurally defaulted because it could have been raised at trial or on appeal. All of the alleged facts that the prosecution purportedly failed to investigate, discover, and disclose to Mason about Quincy were unquestionably known to Mason and his counsel before trial and on appeal.

Additional evidence in the trial record, the content of which is not disputed by Mason, clearly illuminates the extent of Mason's knowledge. The record contains an outpatient mental evaluation report dated Oct. 17, 1994, marked and admitted as Defendant's Ex. 1 at the sentencing hearing. (R. Vol. 1 at 299-304). In it, Dr. Lawrence Maier writes that Mason reported "a long history of illegal street drug (as well as alcohol) [use,] including daily use of marijuana, occasional LSD and strong marijuana ('reefer')." (*Id.* at 301). When Maier asked Mason about his drug use at the time of the crime, "he showed good recall of pre-crime drug involvement as to type and consumption, and could report with adequate clarity the apparent drug-hallucinatory activity that

occurred during the crime itself." (*Id.* at 303).  Mason told the doctor he consumed alcohol, LSD, "Mad Dog" and Marijuana before the offense and had never been that high before.  The doctor concluded Mason was significantly intoxicated at the time of the offense.  (*Id.*).

The second relevant document is the Trial Court's Exhibit A to sentencing, which is a Youthful Offender report.  (R. Vol. 1 at 305-309).  Again, Mason does not dispute the content of the report.  The report was prepared for the Capital Murder offense and a Robbery/Attempted Murder offense.  The latter offense occurred at another convenience store in Huntsville and also involved the use of a gun.  (*Id.*).  The offender wanted money from the cash register, the store videotape, and tried to shoot the clerk three times but the gun jammed each time.  The suspect took the videotape and left. The report says "a witness" saw Mason do it and that, when Mason left the store, the witness was told to forget he saw Mason.  (*Id.*).  When subsequently identified by the victim, Mason confessed to the second crime in full.  He said he left the store and jumped into a truck driven by Quincy Black and Keith Byers.  Both Black and Byers were questioned and denied any knowledge of Mason's intent to conduct a robbery.  They stated Mason had pumped $2 worth of gas and had gone inside to pay.  Black stated that he saw Mason robbing the store and tried to pull out of the station but traffic prevented him from reaching the street before Mason was able to jump into the vehicle.  (*Id.*).  Mason purportedly tried to give the gun to Byers, who refused to take it.  Neither Black nor Byers were charged.  (*Id.*).  Trial counsel cross-examined law enforcement officers regarding the second robbery charge during a pre-trial suppression hearing.  Although the trial court

would not permit identification of the confidential informant[11] in the Capital Offense now at issue, Mason was well aware of the dynamics of the prosecutorial investigation.  (R. Vol. 2 at 190-194).

Significantly, law enforcement officials admitted to Mason's lawyers during a pre-trial hearing that the informant had received a reward from Crimestoppers.  (R. Vol. 3 at 265-66).  Had Mason elected to pursue the "defense" he now considers imperative, he could have done so at the guilt phase of trial, and he could have testified to the alleged involuntary intoxication at the penalty phase of trial.  (He did in fact testify in his own behalf at the hearing).  He also could have pursued this issue on direct appeal.  This claim is due to be dismissed and Mason's request for discovery is due to be denied.  There is no material evidence which was in the possession of the prosecutor of which Mason was unaware which could have had an effect on the outcome of the trial or sentencing.

**B.**     **Petitioner was denied his Sixth Amendment right to confront witnesses against him.**
(Doc. 17, ¶¶ 42-61 at 19-28).  *Crawford  v. Washington,* 541 U.S. 36 (2004).

Mason alleges that the trial court violated his Sixth Amendment right to confront his accusers when it allowed Detective Renfroe to testify to four out-of-court statements made "by witness/informant Quincy [Black], several of which directly implicated [Mason] in the crime for

---

[11]     In his petition, Mason did not raise a constitutional claim attacking the trial court's failure to disclose Quincy Black's identity.  In his reply brief, Mason does assert that the trial court failed to apply the "proper standard" to deny disclosure because it relied solely on the prosecutor's assertion that the information regarding Black did not exist (because they allegedly did not investigate him) and because Black had "fear."  (Doc. 35 at 17).  The appellate court relied, in part, on *Roviaro v. United States*, 353 U.S. 53 (1957) to affirm that the trial court's decision was not an abuse of discretion.  *Mason v. State*, 768 So.981, 1001-02 (Ala. Crim. App. 1998).

Further in-depth discussion is unnecessary, however, because, even if the prosecution had been directed to disclose Black's identity, Mason's assertion that "he would have benefitted greatly . . . as he would have been able to compel Quincy [Black] to appear and submit to cross-examination despite his wish to 'remain confidential'" lacks substance.  (*Id.* at 18).  In light of the information obviously already known to Mason, additional information contained in Dr. Maier's Outpatient Forensic Evaluation and the Youthful Offender report, as well as Mason's confession and his own penalty phase hearing testimony, it is difficult to determine how Black's testimony would have benefitted Mason.  If anything, confrontation and cross-examination of Black would have proved to be very dangerous, if not, fatal to Mason's defense.

which he had been convicted."  (Doc. 17 at 19-20)(citing *Crawford v. Washington*, 541 U.S. at 36)(emphasis by petitioner).  Mason contends that "the <u>only</u> issue necessary to resolve [his] Sixth Amendment claim is whether any or all of the [following] four statements were testimonial", *e.g.* "'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " (*Id.*)(quoting *Crawford*, 541 U.S. at 52)).

The statements purportedly made by Quincy [Black] are:

a.     that Quincy was interested in or had information about a .380 caliber pistol used in the homicide (R. 1155) and that he knew an individual he thought was involved in the homicide who had a .380 caliber pistol (R. 1157);

b.     that the murder weapon was a Davis brand gun (R. 1155-56);

c.     that the murderer's name was Derrick Mason (R. 1157);

d.     that [Mason] was "out of control . . . trying to make a name for himself and that he was involved in this homicide."  (R. 1157).

(*Id.* at 19).

Mason's trial counsel did not raise a hearsay objection to the statements during trial, as required by Alabama's contemporaneous objection rule.  On direct appeal, the Alabama appellate courts conducted a plain error review limited to answering whether the statements were indeed inadmissible hearsay.  *See Mason v. State*, 768 So.2d at 1002; *Ex parte Mason*, 768 So.2d at 1011.  Mason contends that the

Alabama Court of Criminal Appeals held the trial court had not committed plain error in admitting Quincy's statements because they were admitted to explain the investigation and were therefore non-hearsay. . . . Although the Alabama Supreme Court upheld this finding, it expressed concern, noting that the state purpose of admitting this testimony was "dubious."  *Ex Parte Mason*, 768 So.2d at1011.

25

(Doc. 17 at 23).[12]   Mason now declares the statements were hearsay because they "were admitted to prove the truth of the matter asserted, or had that effect, notwithstanding the trial judge's ruling admitting them as 'explanatory[,]'" and such admission was not harmless error. (*Id.* at 27-28). In his reply brief, Mason contends "Quincy's unsolicited statements to police were inadmissible hearsay, and the trial court's admission of those statements through a police officer's testimony was contrary to clearly established Supreme Court case law." (Doc. 35 at 19-20) (citing *Moore v. United States*, 429 U.S. 20, 30 (1976).

Respondent's answer is twofold. (Doc. 24 at 8-9). First, Respondent declares that, to the extent Mason now seeks to raise a Sixth Amendment Confrontation Clause claim in his habeas petition, the claim is unexhausted and procedurally defaulted because he did not "fairly present" this specific issue to the state court in his brief on direct appeal. (Doc. 24 at 8-9) (citing *O'Sullivan v. Boerckel*, 526 U.S. [838,] 842-843 [(1999)]; *McNair v. Haley*, 416 F.3d 1291 (11th Cir. 2005)). Next, Respondent answers that to the extent Mason "is alleging . . . that Investigator Renfroe's testimony regarding the confidential informant's information constitutes inadmissible hearsay," he cannot show that the state court's adjudication of the claim was contrary to or an unreasonable application of clearly established federal law or an unreasonable interpretation of the facts in light of the evidence before it.

Issue V of Mason's brief on direct appeal[13] is captioned, "DID THE TRIAL COURT ERR IN DENYING THE APPELLANT'S REQUEST TO REVEAL THE IDENTITY OF AN ALLEGED

---

[12]   In his reply brief, Mason asserts that this opinion is a finding that the statements were indeed hearsay in that they were admitted to show the proof of the matter asserted. (Doc. 25 at 26). The opinion simply does not state that the statements "were indeed hearsay."

[13]   Mason's brief in support of his petition for writ of certiorari is identical. *See* (C.R. Vol. 13 at 15-16).

CONFIDENTIAL INFORMANT?" (C.R. Vol. 12, Tab. 34 at 21). In the text of the Claim, Mason alleged the trial court erroneously refused "several attempts" by the defense to discover the identity of a "so-called" confidential informant, even though he filed "a motion for expanded discovery pursuant to the mandates of *Ex Parte Monk*, 557 So.2d 832 (Ala. 1989)." (*Id.*).

Mason argued that the individual was not a confidential informant in the legal sense because Detective Renfroe had "had no previous dealings with [him], and no track record of reliability." (*Id.*). Yet, Renfroe was allowed to testify to the informant's statements. In the last sentence and one-half of his brief, Mason adds that the

> informant, in effect, was allowed to testify in this case to the jury through Detective Renfroe. The informant's testimony was clearly hearsay and Mason was deprived of his Sixth Amendment right to confront the witness who accused him of this crime.

(*Id.* at 13-14).

Although Mason's description of his claim is inartful, considerable effort was expended in the text related to the inadmissibility of the hearsay statements of the informant. He also identified the Sixth Amendment and asserted that he was denied his right to confront a witness against him. If this court were to assume that Mason's claim had been fairly presented to the state court, that the state court failed to make a specific ruling concerning the Confrontation Clause claim, that the informant's statements are testimonial as established by *Crawford* and its progeny, and that the Alabama Supreme Court actually made a finding[14] that the statements were indeed hearsay such that the Confrontation Clause is implicated, Mason is not entitled to relief. Mason simply cannot establish that the state court's application of the plain error standard to the "inadmissible hearsay"

---

[14] It is not sufficiently clear that the Alabama Supreme Court held that statements were hearsay.

claim entitles him to habeas relief, nor can he independently show that the same facts, viewed

through the Confrontation Clause, resulted in a fundamentally unfair trial.[15]

The court begins with the Alabama Supreme Court's decision regarding inadmissible

hearsay.  It reads:

> At trial the defendant-petitioner did not preserve for review any of the issues
> we will discuss.  Thus, the issues will be considered under the "plain-error" rule.
>
> "'"Plain error" only arises if the error is so obvious that the failure to notice
> it would seriously affect the fairness or integrity of the judicial proceedings.'"  *Ex
> parte Womack*, 435 So.2d 766, 769 (Ala.1983) (quoting *United States v. Chaney*, 662
> F.2d 1148, 1152 (5th Cir.1981)).  *See also Ex parte Woodall*, 730 So.2d 652
> (Ala.1998).  "'In other words, the plain-error exception to the contemporaneous
> objection rule is to be "used sparingly, solely in those circumstances in which a
> miscarriage of justice would otherwise result."'"  *Ex parte Land*, 678 So.2d 224, 232
> (Ala.1996) (quoting *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d
> 1 (1985) (quoting *United States v. Frady*, 456 U.S. 152, 163, 102 S.Ct. 1584, 71
> L.Ed.2d 816 (1982))).  This Court may take appropriate action when the error "has or
> probably has adversely affected the substantial rights of the petitioner."  Rule 39(k),
> Ala. R.App. P.  "[A] failure to object at trial, while not precluding our review, will
> weigh against any claim of prejudice."  *Ex parte Woodall*, 730 So.2d at 657 (citing
> *Kuenzel v. State*, 577 So.2d 474 (Ala. Crim. App. 1990), aff'd, 577 So.2d 531 (Ala.),
> *cert denied*, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991)).
>
> The petitioner complains that the trial court allowed the State, without
> objection from the defendant, to elicit testimony from the investigating officer
> recounting out-of-court declarations by an informant incriminating the defendant.
> The out-of-court declarations included an identification of the murder weapon, a
> description of the defendant, the name of the defendant, and a statement that the
> defendant was "out of control" and that he was "trying to make a name for himself
> and that he was involved in this homicide."  The petitioner further complains that the
> trial court allowed the assistant prosecutor to argue, without objection by the
> defendant, that "you must simply take, because it has been held admissible, the
> information that the confidential informant provided, as a matter of law."
>
> The informant's out-of-court declarations had been offered, without
> objection, for the dubious purpose of showing why the officer conducted his

---

[15]/   This court's decision must be the same whether the Confrontation Clause claim is reviewed *de novo* or under
28 U.S.C. ¶ 2254(d).

investigation and expressly not for the purpose of proving the truth of the matter stated.[16]  Likewise, the trial court had admitted this testimony expressly subject to these limitations.   The out-of-court declarations would have been inadmissible hearsay for the truth of the matter stated.  Rule 801 C; C. Gamble, *McElroy's Alabama Evidence*, § 242.01(2) (5th ed. 1996).  Thus, to the extent the prosecutor's remarks can be construed as arguing out-of-court declarations for the truth of the matter stated, the argument was improper.

Neither the admission of the testimony about the informant's out-of-court declarations nor the prosecutor's argument can work a reversal, however, unless the defendant suffered enough prejudice to meet the standards of the plain-error rule. Rule 45, Ala. R.App. P.  Moreover, the plain-error rule does not entitle a defendant to relief if reasonable trial tactics or strategy could account for the defendant's not interposing an objection or otherwise preserving the matter for review.  *Hallford v. State*, 629 So.2d 6 (Ala. Crim. App. 1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994); *Luke v. State*, 484 So.2d 531 (Ala. Crim. App.1985). We judge the reasonableness of such tactics or strategy from the circumstances as they would have been perceived by the defense at the time for preserving error rather than at a later time in hindsight.  *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 LED.2d 674 (1984); *Duren v. State*, 590 So.2d 360, 362 (Ala. Crim. App.1990), *aff'd*, 590 So.2d 369 (Ala. 1991), *cert. denied*, 503 U.S. 974, 112 S.Ct. 1594, 118 LED.2d 310 (1992); *Falkner v. State*, 586 So.2d 39 (Ala. Crim. App. 1991).

The defense may have intentionally allowed the admission of the out-of-court declarations of the informant in order to reap the mitigating benefit of the informant's

---

[16/]   The plain error review completed by the Alabama Court of Criminal Appeals reads:

> Investigator Renfroe's testimony did not constitute inadmissible hearsay because it was not offered to prove the truth of what the "tipster" told Renfroe; rather, it was offered to explain Renfroe's actions and the sequence of events following his conversation with the "tipster."  See *Sawyer v. State*, 598 So.2d 1035, 1038 (Ala. Cr. App.1992), cert. denied, 506 U.S. 943, 113 S.Ct. 386, 121 L.Ed.2d 295 (1992); and *D.R.H. v. State*, 615 So.2d 1327 (Ala. Cr. App. 1993).  Moreover, following Investigator Renfroe's testimony, the trial court thoroughly cautioned the jury that Renfroe's testimony regarding statements made to him during the course of his investigation were not offered to prove the truth of those statements; rather, the testimony was offered as an explanation of the sequence of events and to explain Renfroe's actions.  "[T]he trial judge's thorough limiting instruction was more than adequate to explain to the jury the purpose for which the evidence was received."  *Roper v. State*, 695 So.2d 244, 246 (Ala. Cr. App.1996), cert. denied, 695 So.2d 249 (Ala. 1997).  Accordingly, we find no error in allowing Detective Renfroe to testify to the substance of his conversation with the "tipster."

*Mason v. State*, 768 So.2d 981, 1001-1002 (Ala. Crim. App. 1998).  (bracketed text by this court).

statement that the defendant was "out of control."  Indeed, at the sentencing phase, the defense did argue the sixth statutory mitigating factor-that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired."  (Emphasis added.)  Section 13A-5-51, Ala.Code 1975.

Moreover, rulings by the trial court either excluding the informant's out-of-court declarations or prohibiting the prosecutor's argument regarding the declarations could not have substantially increased the likelihood of either an acquittal or a life-without-parole recommendation.  The State's evidence against the defendant was chiefly that the authorities had seized the murder weapon from the defendant's possession and that the defendant had given a detailed confession describing not only the murder itself but also the defendant's bizarre and cruel conduct culminating in the murder.  Two police officers observed and heard the confession and recounted it to the jury with enough consistency to impart great credibility to their testimony and, indeed, just enough inconsistency in some details to prevent their testimony from being suspect as the product of improper collaboration.  The out-of-court declarations by the informant pale into insignificance in comparison with this other damning evidence.  Furthermore, the trial judge expressly instructed the jury not to consider the informant's out-of-court declarations for the truth of the matter stated.  Thus we do not find prejudice that would warrant relief under the plain-error rule.

*Ex parte Mason*, 768 So.2d 1008, 1011-1012 (Ala. 2000).

To the extent that the last paragraph of the Alabama Supreme Court's decision regarding the potential prejudice of confidential informant's statements contains factual findings, those findings are entitled to a presumption of correctness.  If this court were entitled to independently review the hearsay question as a distinct and separate aspect of Mason's Confrontation Clause claim, the court would concur with the factual findings made by the state court in determining whether Mason is entitled to relief.  The evidence of Mason's guilt was overwhelming and, as such, his trial was not rendered fundamentally unfair by the admission of the confidential informant's statements.  This claim is due to be denied.

C.   **Jury Instructions given during the guilt and sentencing phases deprived Mr. Mason of a fair trial**.  (Doc. 17, ¶¶ 62-73 at 28-34).

   1.   **Failure to instruct on intoxication to negate specific intent**.  (Doc. 17, ¶¶ 62-64 at 28-29).

   2.   **The trial court reversibly erred in instructing the jury at the sentencing phase of the trial**.  (Doc. 17, ¶¶ 65-73 at 29-34).

Mason did not raise these claims on direct appeal.  The claims were presented for the first time in his Rule 32 petition and found by the trial court to be procedurally defaulted pursuant to Ala. R. Crim. P. 32.2(a)(3) & (5).  (Rule 32 C.R. Vol. 16, Tab. 55 at 62).  Mason's notice of appeal from the denial of the Rule 32 petition was dismissed as untimely by the Alabama Court of Criminal Appeals.  (*Id.* at Tab. 56).  For these reasons, and after a careful examination of the record and applicable law, this court finds it is precluded from further review of these claims.  The claims are procedurally defaulted and due to be dismissed.

D.   **Several of the trial court's rulings deprived Mr. Mason of constitutional protections and therefore constitute reversible error**.  (Doc. 17, ¶¶ 74-87 at 34-40).

   1.   **The trial court erred in admitting into evidence highly prejudicial expert testimony.**  (Doc. 17, ¶¶ 74-75 at 34-35).

Mason alleges the trial erred when it allowed forensic scientist John Kilbourn to testify that a "'Negroid'" hair found on the victim's pubic region was "'consistent'" with a pubic hair taken from Mason.  (Doc. 17 at 34) (quoting R. 758-62).  According to Mason, the testimony was "highly inflammatory" and "had no probative value" as Kilbourn also "testified that he had no way of knowing how many other men in Madison County had hair with the same characteristics as the

31

'Negroid' hair in question," that he could not identify the hair as Mason's, or that it was even a pubic[17] hair.  (*Id.* at 34-35)(quoting R. 777-78).

Mason concedes that this claim was not raised by counsel on direct appeal, but nonetheless encourages the court to conduct a *de novo* review of it by inferring that the state appellate courts conducted an "independent" merits review of it.  (Doc. 35 at 64-65).  Mason supports this argument by asserting:

> [T]he Court of Criminal Appeals "searched the entire record for any error that may have adversely affected the appellant's substantial rights, whether or not brought to our attention or to the attention of the trial court."  *Mason v. State*, 768 So.2d 981, 1007 (Ala. Crim. App. 1998).  The Alabama Supreme Court implicitly adopted "the result on every issue addressed by the Court of Criminal Appeals" after its own independent review.  *Ex parte Mason*, 768 So.2d 1008, 1010 (Ala. 2000).  As the claim has been fully reviewed on direct appeal, the State cannot argue now that this claim is procedurally defaulted.

(*Id.*).

The quotations taken from the state appellate courts' opinions are nothing more than an acknowledgment of the existence of routine plain error review utilized during the direct appeal review process of capital cases in Alabama.  "[I]t [is] . . . a well-established principle that a state appellate court's routine plain error review of a conviction or sentence does not, standing alone, excuse a procedural default."  *Peoples v. Campbell*, 377 F.3d 1208, 1235, n. 55 (11th Cir. 2004) (other citations omitted).  Other than stating it had examined the record for plain error and found none, on direct appeal the state appellate courts engaged in no analysis of the merits of this particular

---

[17]   Kilbourn testified that in his opinion, the foreign hair found in the victim's pubic area was a pubic hair of African derivation.  (R. Vol. 5, Tab. 12 at 760).  He also later testified "but, as I say, sometimes hairs are - - from different body origins [such as chest hair], can look very, very similar [to pubic hair]."  (R. Vol. 5, Tab. 12 at 777).  He did not compare Mason's chest hair to the hair found in the victim's pubic area.  (*Id.*).  He did compare Mason's head hair to the found hair and opined that the found hair was "definitely" not Mason's head hair.  (*Id.* at 762).

claim.  As such, contrary to Mason's assertion, the claim was not 'fully reviewed' on direct appeal.

It is procedurally defaulted.[18]

Mason alternatively argues that if the court finds the claim to be procedurally defaulted, the

failure of his counsel to raise the claim on direct appeal establishes the necessary cause and prejudice

to overcome the procedural default of the claim.  (Doc. 35 at 65).

In *Eagle v. Linahan*, 279 F.3d 926 (11th Cir. 2001), the Eleventh Circuit explained

ineffective assistance of counsel in the context of cause and prejudice to excuse a procedural default:

> The Supreme Court, . . . made clear in *Murray v. Carrier*, 477 U.S. 478, 486-87, 106 S.Ct. 2639, 2644, 91 LED.2d 397 (1986), that "the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default."  This is true whether the procedural default resulted from counsel's failure to make a claim at trial or failure to raise a claim on appeal.  *Id.* at 492, 106 S.Ct. at 2647 (holding that "counsel's failure to raise a particular claim on appeal is to be scrutinized under the cause and prejudice standard when that failure is treated as a procedural default by the state courts").  Moreover, attorney error is cause for procedural default only if the error rises to the level of constitutionally deficient assistance of counsel under the Sixth Amendment.  *Id.* at 488, 106 S.Ct. at 2645.

*Id*. at 937.

A claim of ineffective assistance must itself be both exhausted *and* not defaulted in state

court before it can be asserted as cause.  *Hill v. Jones*, 81 F.3d 1015, 1030-31 (11th Cir. 1996).  If

the ineffective assistance claim is defaulted, then a petitioner must demonstrate independent cause

and prejudice excusing the default of the ineffectiveness claim before that claim can be asserted as

cause in relation to a second, substantive claim.  (*Id.*).

---

[18]    The post-conviction court did not interpret the direct appeal in the manner Mason suggests either.  When the claim was raised during post-conviction proceedings, the trial court found it to be procedurally defaulted pursuant to ALA. R. CRIM. P. 32.2(a)(2) and (5) in that it was raised and addressed at trial and could have been, but was not raised on direct appeal.  (Rule 32 C.R. Vol. 16, Tab. 55 at 61).  Mason failed to timely appeal from the post-conviction court's decision.

Mason did raise an ineffective assistance of appellate counsel claim concerning Kilbourn's testimony in his Rule 32 petition.[19]   However, the post-conviction court dismissed the claim for failing to meet the "specificity and full factual pleading requirements of Rule 32.6(b) ARCrP." (Rule 32 C.R.  Vol. 16, Tab. 55 at 58).  It noted that Mason failed to cite any legal authority to support an argument that, had counsel raised the claim on direct appeal, the appellate courts would have excluded Kilbourn's testimony.  (*Id.*).

Mason failed to timely appeal from the trial court's rejection of the claim in the Rule 32 petition.  Moreover, Mason has not raised an independent ineffective assistance of appellate counsel claim in his habeas petition.  Even if he had, the habeas claim would be procedurally defaulted because Mason failed to timely appeal from the state post-conviction court's dismissal of the claim as insufficiently pleaded pursuant to ALA.R CRIM. P. 32(6)(b).  For the foregoing reasons, Mason cannot rely on his appellate counsel's purported ineffectiveness to establish cause to excuse the procedural default of the substantive claim at issue because the ineffectiveness claim itself is procedurally defaulted.  For these reasons, and after a careful examination of the record and applicable law, this court finds it is precluded from further review of the claim.  This claim is procedurally defaulted and due to be dismissed.

---

[19]   In his Rule 32 petition, Mason did allege that appellate counsel were ineffective for failing to raise as an issue that:

> The trial erred in admitting highly inflammatory and prejudicial testimony of little or no probative value when it allowed Mr. John Kilbourn to testify that hair found in the pubic region of the victim was "consistent" with pubic hairs taken from Mr. Mason.  *See infra* Issue VI ([the substantive claim] incorporated by reference).

(Rule 32 C.R. Vol. 14, Tab. 41 at 18) (bracketed portion by this court).

    2.    **The trial court erred in denying petitioner's motion to suppress the search of his vehicle.**  (Doc. 17, ¶¶ 76-77 at 35-36).

Mason alleges that, after his arrest, "his car was impounded by Officer Hasty" and Hasty recovered the murder weapon from the car after performing an inventory search that was not in accordance with "any standardized procedure."  (Doc. 17 at 35-36).  He contends a standardized procedure is constitutionally mandated and, as such, the trial court's refusal to suppress the murder weapon at trial was erroneous.  (*Id.* at 36) (citing *Florida v. Wells*, 495 U.S.1 (1990)).

Respondent answers that, under *Stone v. Powell*, 428 U.S.465 (1976), "a federal court cannot entertain a Fourth Amendment claim by a habeas petitioner attacking his state court conviction if the petitioner had an opportunity for full and fair consideration of that claim in the state trial and appellate courts."  (Doc. 24 at 18) (also referring to *Harris v. Dugger*, 874 F.2d 756 (1989)).

Alternatively, respondent contends that Mason cannot show that the state court's adjudication of the claim on direct appeal is contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence before it.  (*Id.* at 18-19).

Mason does not dispute that, following a hearing, the trial court denied his motion to suppress, or that the Alabama Court of Criminal Appeals found no error on direct appeal.  He complains the trial court made no findings to support its ruling and the appellate court's opinion was "not adequate to qualify as 'full and fair consideration'" of the claim.  (Doc. 35 at 79-80)(quoting *Agee v. White*, 809 F.2d 1487 (11th Cir. 1987)(other citations omitted by this court).

After careful review of the record, this court finds that the *Stone* doctrine prohibits federal habeas consideration of this claim.  With the pre-trial motion and the subsequent suppression

hearing, Mason's counsel had ample opportunity to raise all aspects of this claim.  He was able to

conduct cross-examination of Officers Goings and Hasty regarding inventory searches of vehicles

as well as police department policy concerning such searches.  (R. Vol. 2, Tab. 6 at 117, 144-58).

It was only after the consideration of this evidence that the trial court denied the motion.  The

Alabama Court of Criminal Appeals issued a lengthy opinion denying the claim on direct appeal.

*Mason  v. State*, 768 So.2d 981, 996-999  (Ala. Crim. App. 1998).  The opinion included findings

that Mason's arrest was lawful and that impoundment of his vehicle was lawful.  (*Id.* at 998).  The

appellate court also held that

> Contrary to [Mason's] assertion, there was evidence regarding the police
> department's policy on inventory searches.  While the testimony regarding the
> inventory procedures was not as detailed as it could have been, there was sufficient
> evidence produced to determine that there was a policy, what that policy was, the
> reasonableness of the policy, and that the officers acted in compliance with the
> established criteria when they conducted the inventory search-especially in light of
> the fact that the appellant did not raise this particular ground either before or during
> the suppression hearing, where it could have been thoroughly addressed.
> Accordingly, we find no plain error in the trial court's denial of the appellant's
> motion to suppress the evidence found in his vehicle.
>
> Even if we were to conclude that the search was not authorized pursuant to
> an inventory search, the trial court's denial of the motion to suppress is due to be
> affirmed because the search of the appellant's vehicle was lawful as a search incident
> to an arrest.  *Sheffield*, 606 So.2d at 187.  This is so even though the appellant was
> already handcuffed and placed in the police officer's car when the appellant's car was
> searched. *Gundrum v. State*, 563 So.2d 27 (Ala. Crim. App. 1990).

*Mason v. State*, 768 So.2d 981, 999 (Ala. Crim. App. 1998).

The Alabama Supreme Court affirmed the appellate court's decision.  *Ex parte Mason*, 768

So.2d 1008, 1013 (2000).  Mason was afforded a full and fair opportunity to adjudicate this Fourth

Amendment claim in the state court during the direct review process.[20]   He also received full and

fair consideration of the claim in the state court.  Pursuant to *Stone v. Powell*, this court will afford

no further discussion to this claim.

>   **3.   The trial court erred in denying petitioner's motion to suppress his custodial statement.**  (Doc. 17, ¶¶ 78-81at 36-38).

On direct appeal, this *entire* claim read:

>   As mentioned in the preceding argument[21], Mason was placed under arrest for assault in the third degree. . . . during the evening of March 29, 1994.  Mason was transported to the Huntsville Police Department, and there he was interrogated for several hours by detectives.  Mason's contention is that his arrest on the third-degree assault was merely a pretext for the police to interview him about the homicide of Ms. Cagle.  Mason confessed to the third-degree assault, and as such any further questioning of Mason regarding other alleged incidents was in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).  The continued questioning of Mason after his alleged statement regarding the misdemeanor assault was in violation of his rights under *Miranda*, and as such, the alleged custodial statement should have been suppressed by the trial court.

(C.R. Vol. 12, Tab. 34 at 20).

Mason repeats the allegation in his habeas petition.  (Doc. 17, ¶¶ 78 and 80 at 36-37).

Additionally he declares that his Sixth Amendment right to invoke counsel was violated and, further,

---

[20]   In his reply brief, Mason contends that if this court finds that *Stone* bars federal review of the claim, then the ineffectiveness of his trial counsel to investigate and preserve the procedure and policies aspect of issue on direct appeal supplies the necessary cause to overcome the bar.   However, Mason has not presented the underlying factual claims in connection with an independent ineffectiveness claim in his habeas petition. Even if he had, it would be procedurally defaulted because, although Mason raised just such a claim in his Rule 32 petition (*see* Rule 32 C.R. Vol. 14 Tab. 41 at 6), he failed to timely appeal the Rule 32 court's denial (*see i.d.*, Vol. 16, Tab. 55 at 17) of the claim on the merits during post-conviction review, which was based in part on the appellate court's findings on direct appeal.  Mason has never denied that he failed to effectuate a timely appeal from the rejection of his Rule 32 petition or that his Notice of Appeal was dismissed by the Alabama Court of Criminal Appeals because of its untimeliness.  A procedurally defaulted ineffective assistance of counsel claim cannot serve as cause to overcome the procedural default of another claim.  *Hill v. Jones*, 81 F.3d 1015, 1030-31 (11th Cir. 1996).

[21]   Referring to his argument that the trial court erred when it denied his motion to suppress the search of his automobile.  (C.R. Vol. 12, Tab. 34 at 19).

that his statement concerning the Cagle murder was the product of physical and mental coercion. (*Id.*, ¶¶78, 79 and 81 at 36-38).  The additional claims were presented for the first time in Mason's Rule 32 petition.  The new claims were dismissed as procedurally defaulted by the trial court because the claims were raised at trial and could have been but were not presented on direct appeal.  (*See respectively*, (Rule 32 C.R. Vol. 14, Tab. 41 at 20-21) and (*id.,* Vol. 16, Tab. 55 at 60-61) (citing A. R. CRIM. P. 32.2 (a)(2) and (5)).  Mason filed a notice of appeal from the rejection of this claim.  The Alabama Court of Criminal Appeals then dismissed that appeal as untimely in accord with Alabama procedural rules, a fact that Mason has never disputed.  For the reasons set out above, Mason's claim that his Sixth Amendment right to counsel was violated and that he was coerced into making a statement are procedurally defaulted.  These issues are due to be dismissed.

The only allegations that are *potentially* subject to habeas review are those that were raised on direct appeal; *i.e.*, whether Mason's statement concerning the Cagle murder should be suppressed because it was the product of a pretextual arrest for third degree assault and, after having been read his *Miranda* rights and giving a statement regarding the assault, he was interrogated for the Cagle murder without again being read his *Miranda* rights.  (Doc. 17, ¶¶ 78 and 80 at 36-37)(citing *Miranda v. Arizona*, 384 U.S. 436 (1966); *Westover v. United States*, 384 U.S. 436 (1966)).

Respondent argues that *Stone v. Powell*, 428 U.S. 465 (1976), prohibits federal review of this claim because Mason "had an opportunity for full and fair consideration of that claim in the state trial and appellate courts."  (Doc. 24 at 20-21).  Alternatively, Respondent contends "the merits of this claim were addressed by the Alabama Court of Criminal Appeals on direct appeal and Mason does not allege the appellate court's decision was contrary to or an unreasonable application of

clearly established federal law. (*Id.* at 21) (citing *Mason v. State*, 768 So.2d 981-999-1001 (Ala. Crim. App. 1998)).

Mason asserts that he did not receive "'full and fair consideration'" of the claim by the state court. (Doc. 35 at 79-80)(quoting *Agee v. White*, 809 F.2d 1487 (11th Cir. 1987)(other citations omitted by this court).  The opinion of the Alabama Court of Criminal Appeals reads:

> The appellant contends that the trial court erred in denying his motion to suppress his custodial statement because, he claims, "his arrest on the third-degree assault was merely a pretext for the police to interview him about the homicide of Ms. Cagle." (Appellant's brief, p. 20.)  As we noted in Part III of this opinion, the appellant filed three suppression motions; this ground was not specifically raised in any of those motions.  Furthermore, although the appellant hinted at this ground during the suppression hearing, he did not specifically move to suppress his confession on this basis.  Accordingly, we must review his assertion pursuant to the plain error doctrine.  Rule 45A, Ala. R. App. P.

> The pertinent evidence presented at the suppression hearing established the following.  The appellant was arrested pursuant to an outstanding arrest warrant against him for third-degree assault.  Following the appellant's arrest, he was transported to the criminal investigation division (CID).  En route to CID, the appellant asked what he was being arrested for and the officers told him he was being arrested for third-degree assault, and then an officer read him the arrest warrant. On the way to CID, there was no discussion regarding the murder of Angela Cagle.

> At CID, the appellant was fingerprinted, photographed, and apprised of his rights.  The appellant did not appear to be under the influence of alcohol or drugs. The appellant waived his rights and spoke with investigators about the assault charge. During the questioning regarding the assault charge, the investigators learned that a victim of a robbery and an assault that had occurred approximately two weeks earlier had identified the appellant as the assailant from a photographic line-up.  The appellant was then informed that he was under arrest for robbery and attempted murder.  He was again apprised of his rights.  The appellant waived his rights and denied any knowledge of the robbery/attempted murder incident.

> An investigating officer then questioned the appellant about the gun found in the appellant's vehicle.  The appellant admitted that he had a gun in his vehicle, but he said that it did not belong to him.  During the course of the questioning, the investigating officers were informed that the gun found in the appellant's vehicle was the murder weapon.  When the appellant was confronted with this information, he denied any knowledge of the murder.

39

The appellant subsequently asked to speak with Investigator Bud Parker alone.  Parker again advised the appellant of his rights.  The appellant waived his rights and confessed to the murder of Angela Cagle.

"'In *Scarbrough* [*v. State*, 621 So.2d 996 (Ala. Cr. App. 1992)], we adopted the "objective" test set forth by the Fifth Circuit Court of Appeals with regard to determining the validity of an alleged pretextual arrest:

"'"'Again and again in precisely the present context, the [Supreme] Court has told us that where police officers are objectively doing what they are legally authorized to do-as in arresting [the defendant] pursuant to the valid warrant outstanding against him and interrogating him without coercion after reading him repeated Miranda warnings - the results of their investigations are not to be called in question on the basis of any subjective intent with which they acted. . . .

"'"'. . . The relevant principle of the Supreme Court is likewise: so long as police do no more than they are objectively authorized and legally permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry. . . .  The correct rule is that, while a showing of objectively reasonable good faith on the part of the police officers will ordinarily redeem honest errors and prevent the application of the exclusionary rule, in a case where the officers have taken no action except what the law objectively allows [,] their subjective motives in doing so are not even relevant to the suppression inquiry.  And the reason lies in the purpose of that rule: to deter unlawful actions by police.  Where nothing has been done that is objectively unlawful, the exclusionary rule has no application and the intent with which they acted is of no consequence.'"

" ' " . . . .

> "*United States v. Causey*, 834 F.2d 1179, 1184-85 (5th Cir.1987) (emphasis in original) (footnotes omitted)." *Scarbrough*, 621 So.2d at 1004."

*Webster v. State*, 662 So.2d 920, 921-22 (Ala.Cr.App. 1995), quoting *Fletcher v. State*, 621 So.2d 1010, 1022-23 (Ala.Cr.App. 1993). *See*, also, *Hutcherson v. State*, 677 So.2d 1174 (Ala. Cr. App.1994), rev'd on unrelated ground, 677 So.2d 1205 (Ala. 1996).

> In this case, the police arrested the appellant pursuant to an outstanding warrant for third-degree assault. The appellant does not challenge the validity of the arrest warrant. The evidence established that the appellant was advised of his rights three separate times, and that each time he knowingly and voluntarily waived his rights and spoke with the police. There was no evidence that the appellant was under the influence of drugs, or that his confession was coerced by inducements or threats. "As long as the police officer is doing only what is objectively authorized and legally permitted, the officer's subjective intent in doing it is irrelevant." *Ex parte Scarbrough*, 621 So.2d 1006, 1010 (Ala. 1993). In this case, the officers' arrest and questioning of the appellant were objectively reasonable; accordingly, we find no plain error in the trial court's denial of the motion to suppress the appellant's custodial statement.

*Mason v. State*, 768 So.2d 981, 999 -1001 (Ala. Crim. App. 1998).

The opinion of the Alabama court establishes that there was full and fair consideration of the claim. *Stone v. Powell*, 428 U.S. 465 (1976), prohibits federal review of the claim, and it is due to be dismissed.

### 4.   The trial court erred in denying petitioner's request to visit the scene of the crime with his attorneys.  (Doc. 17, ¶¶ 82-83 at 38-39).

This claim is identical to a claim asserted in Mason's brief on direct appeal. (Doc. 17 at 38-39) and (C.R. Vol. 12, Tab. 34 at 26). Mason argues that the trial court deprived him of due process and effective counsel when it denied trial counsel's motion to view the crime scene with Mason so that counsel could "properly investigate the case and prepare the defense." (Doc. 17 at 38-39). Respondent answers that Mason cannot show that the Alabama Court of Criminal Appeals' rejection

of this claim on direct appeal is contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence before it. (Doc. 24 at 26-28).

The pertinent portion of the Alabama Court of Criminal Appeals opinion reads:

The appellant maintains that the trial court erred in denying his request to visit the scene of the crime with his attorneys. He argues that the trial court's refusal to allow him to visit the scene with his attorneys denied him the effective assistance of counsel.

In a pretrial motion hearing, the trial court denied the appellant's request to visit the scene of the crime with his attorneys. The trial court ruled that because the appellant was being held in jail without bond, the court could not allow the appellant to visit the scene without a compelling reason to do so; however, the trial court indicated that the appellant's counsel were free to visit the scene. The appellant did not offer the trial court any reason he needed to view the scene of the crime-other than his general assertion in his written motion that his presence at the scene was necessary to assist his counsel in the investigation of the crime-nor did he specifically explain how his defense would be prejudiced if he were not allowed to view the scene. Accordingly, we find no error in the trial court's denial of the appellant's motion to view the scene of the crime with his attorneys.

Moreover, the appellant has not established how the trial court's ruling denied him the effective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, the appellant must show that his counsel's performance was deficient and that, but for his counsel's deficient performance, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The appellant has met neither prong of the two-pronged test set out in *Strickland*. The appellant does not indicate how the trial court's ruling rendered his counsel's performance deficient, nor does he explain how his viewing the scene of the crime with his attorneys could have changed the outcome of the proceedings. Accordingly, the appellant is due no relief on his assertion that the trial court's refusal to allow him to visit the scene denied him the effective assistance of counsel.

*Mason v. State*, 768 So.2d 981, 1004 -1005 (Ala. Crim. App. 1998).

Mason offers no explanation or argument asserting that such a legal or factual finding made by the state appellate court is inconsistent with 28 U.S.C. § 2254(d).  Accordingly, this claim is due to be denied.

**5.    The trial court erred in submitting for the jury's consideration the aggravating circumstance that the capital felony was especially heinous, atrocious or cruel.** (Doc. 17, ¶¶ 84-87 at 39-41).

To the extent that Mason alleges there was no evidence to support submission of the heinous, atrocious, or cruel (HAC) aggravating circumstance to the jury, this claim is identical to one raised on direct appeal.  (Doc. 17 at 39-41) and (C.R. Vol. 12, Tab. 34 at 23-24).  Mason declares, "[t]he State based its [HAC] argument on the mere speculation that the first bullet wound to Ms. Cagle was not fatal, and would have caused her substantial pain.  (R. 1605-1606.)"  (Doc. 17 at 39).  Yet, "the forensic pathologist, . . .  Dr. Embry testified at trial that it was not possible for him to conclude which wound occurred first."  (*Id*).

The Alabama Court of Criminal Appeals rejected this claim, holding:

> The appellant contends that the trial court improperly allowed the jury to consider as an aggravating circumstance that the offense was "especially heinous, atrocious or cruel compared to other capital offenses"[FN4] (Issue VI). . . .[22]  The gist of the appellant's argument is that . . . this aggravating circumstance is based primarily on the assumption that the first bullet wound did not kill the victim, but caused the victim substantial pain - a finding that, he claims, is not supported by the record.  In support of his contention, he argues that because the forensic pathologist who performed the autopsy on the victim could not conclusively determine which of the two bullet wounds occurred first, there was no evidence to support a finding that the first wound to the victim caused severe pain and suffering, but did not kill the

---

[22]    On direct appeal, Mason also alleged, as a separate claim (identified by Alabama Court of Criminal Appeals as "Issue VII"), that the trial court improperly found the existence of the heinous, atrocious, or cruel ("HAC") aggravating circumstance.  The appellate court's opinion simultaneously addressed the constitutionality of the trial court's submission of this aggravating circumstance to the jury and the trial court's finding of the existence of the aggravating circumstance.  In his habeas petition, Mason complains only that the trial court erred when it submitted the HAC factor to the jury for its consideration.  Nonetheless, for reasons explained further in the body of this opinion, the trial court's findings shall also be included.

victim. The appellant did not object to the submission of this aggravating circumstance to the jury, nor did he object to the trial court's finding of this aggravating circumstance; therefore, his assertions must be reviewed pursuant to the plain error doctrine. Rule 45A, Ala.R.App.P.

FN4. See § 13A-5-49(8), Code of Alabama 1975.

While it is true that the forensic pathologist was not able to conclusively determine which bullet wound occurred first, a reasonable inference from the record is that the painful, nonfatal injury occurred first. Dr. Embry testified that the bullet wound to the victim's left cheek was fairly superficial in that it would not cause loss of consciousness or death; however, he testified that such a wound would be extremely painful. Dr. Embry testified that the victim would still have been able to move her legs after the gunshot wound to the left cheek. According to Dr. Embry, the gunshot wound to the victim's right cheek was "instantly" fatal - the victim could not have moved her leg after suffering the bullet wound to the right cheek. The appellant confessed that he shot the victim a second time after he saw her move her leg. Furthermore, she was found lying on her left side; the bullet wound to her right cheek was clearly visible. Thus, one can reasonably infer from the evidence that the first bullet wound caused the victim great suffering, but that it did not kill her.

Moreover, the determination of the existence of the aggravating circumstance that the crime was especially heinous, atrocious, or cruel compared to other capital offenses was not based solely on the fact that the first bullet wound caused the victim great suffering; rather, it was based on a combination of factors. The trial court found, in pertinent part:

"The capital offense was especially heinous, atrocious or cruel compared to other capital offenses. The Court reaches this conclusion based upon the following evidence:

"(a) The victim, Mrs. Cagle, was alone, defenseless and of no physical threat to the Defendant.

"(b) The Defendant caused or directed the victim to disrobe in his presence, obviously inflicting great fear and humiliation in the victim prior to her death. There is no logical explanation for this behavior on the part of the Defendant except his indifference and even enjoyment of the suffering of this victim.

"(c) The victim was shot twice at close range as indicated by the expert testimony. The first shot did

not kill the victim but caused great pain as a result of the shattering of the bone or bones in her face. The second shot was fired into her face as she lay helpless and suffering from the first gunshot wound to the other side of her face.

"(d) The Defendant planned this crime in advance, obtaining the gun used to kill the victim several days earlier and by parking his vehicle out of view and behind the store.

"(e) The Defendant intended to kill the victim by shooting her the second time, realizing that she was still alive, so that there would be no witness to this crime.

"(f) The most heinous, atrocious or cruel aspect of this crime was the execution-style killing of this victim. The court can conclude from the evidence presented, and from the confession of the Defendant, that he first made the victim go into the back storage room of the convenience store, which was not visible from the other parts of the store, or to anyone who might pass. He caused the victim to completely disrobe except for her socks, all of her clothing being found under or near the desk on which her body was found. He shot her at close range while she sat naked and completely vulnerable to the actions of the Defendant. Realizing that Mrs. Cagle was not dead because he saw her move, he inflicted the fatal gunshot wound at close range into the right side of her face. The Court concludes that the crime of this Defendant was extremely wicked, shockingly evil, outrageously wicked and vile and cruel, with the actions of the Defendant designed to inflict a high degree of pain and fear in the victim, with utter indifference to, or even enjoyment of, the suffering of this victim. Any murder of a defenseless victim is to some extent heinous, atrocious and cruel, but the degree of heinousness, atrociousness and cruelty, with which this offense was committed, exceeds that common to all capital offenses."

(C.R. 253-54.)

As evidenced from the above, the finding that the crime was especially heinous, atrocious, or cruel when compared to other capital offenses was based not only on the fact that the first bullet wound caused the victim intense pain, but also on the manner of the murder, as well as the fear and humiliation that the victim most certainly experienced before her death.  These are appropriate factors to consider in determining the existence of this aggravating factor.  See *Ex parte Rieber*, 663 So.2d 999 (Ala.1995).  Accordingly, the trial court did not err in allowing the jury to consider as an aggravating factor that the crime was especially heinous, atrocious, or cruel, nor did it err in finding the existence of this aggravating circumstance.

*Mason v. State*, 768 So.2d 981, 1002 -1004 (Ala. Crim. App. 1998).

In the habeas petition Mason *does not claim the trial court erred* when it found the existence of the HAC factor.  Mason now argues only that it was trial error to allow the jury to consider the existence of the HAC factor because the State's basis for arguing it relied solely on a determination of whether the first or second bullet resulted in the victim's death.

A review of the State's arguments at the penalty phase of trial makes it clear that the HAC factor was not presented to the jury based exclusively on an inference from the evidence as to whether she suffered after being shot the first time.  While Assistant District Attorney Karen Hall did concentrate on this aspect of the HAC factor in the prosecution's opening argument after the close of the penalty phase of trial, on rebuttal, District Attorney Tim Morgan expanded the prosecution's presentation of the HAC factor far beyond this evidence.  Morgan stated:

[W]e have proven to you beyond a reasonable doubt that a murder, intentional murder, was committed during the commission of a robbery, and that the robbery itself is an aggravating circumstance. So we have proven one to you.  And the Judge says we don't have to prove anything else to you, that's enough.  But we - - Mrs. Hall has argued and I . . .  argue to you, also, that we have proved through the evidence presented to you, the testimony of Dr. Embry, the testimony of Bud Parker who gave you or told you what this defendant told him he did, testimony that proved a cold-blooded, calculated execution style or execution-type slaying.  I can't thinks of one

that could be much more cold-blooded and much more execution style than this one was.

> You recall the testimony and you recall the evidence, and I don't need to go over that and stand up here and talk about it, but when a person shoots another and then has the presence of mind to say, "Well, I just don't believe she's dead and I don't intend to leave any live witnesses," and fires one more slug through her brain to kill her, I don't know what could be more heinous, atrocious, or cruel than that. And I think the law is on our side. But, again, you don't have to accept that if you don't want to. And the Court will instruct you of that, and the Court will tell you that you have to consider any mitigating circumstances that they have shown to you. And I ask you to do that. . . . .

(R. Vol. 10, Tab. 26 at 1624-25).

Morgan repeated that he did not think it was necessary to go through the details of how heinous, atrocious, or cruel the crime was because the jury had heard the trial testimony. (*Id.* at 1625).

Morgan's specific reference to Bud Parker's testimony regarding the details of Mason's confession to him as well as reminding the jury to recollect the evidence presented to them shows that the prosecution's presentation of the HAC factor was not based solely on whether the first bullet fired by Mason killed the victim. It was not improper to allow the jury to consider that aggravating circumstance. In fact, the specific facts supporting the trial court's finding of the HAC factor in the sentencing order are derived from the testimony of Bud Parker and Mason's own statement of events surrounding the crime. The fear, humiliation and suffering of the victim prior to her death - all components of the HAC factor in this case - were just as important as the question of whether or not she physically suffered after Mason shot her the first time.

As a final note, Mason asserts that consideration of the HAC factor was improper because the prosecutor argued that Cagle's death was an execution-style killing, a type of murder that the

47

Alabama Supreme Court rejected as being heinous, atrocious, or cruel in *Ex parte Clark*, 728 So.2d 1126 (Ala. 1998).   Once again, Mason overlooks the fact, that in his case, the State relied upon and Alabama courts have consistently interpreted Alabama's HAC factor as including psychological torture as well as physical suffering after an assault.   *See Ex parte Key,* 891 So. 384, 390-91(Ala. 2004); *Ex parte Reiber*, 663 So. 2d 999 (Ala. 1995).

Unlike the victim in *Ex parte Clark*, who was unaware when the defendant approached him from behind and shot him to his death with six successive bullets, Mason's victim was clearly subjected to psychological torture and there was more than enough evidence for the jury to infer that she physically suffered after Mason shot her the first time.   For the foregoing reasons, Mason cannot show that the state court's rejection of this claim is contrary to or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence before it.   This claim is due to be denied.

**E.   Prosecutorial misconduct and error throughout the guilt and sentencing phases deprived petitioner of a fair trial.**   (Doc. 17, ¶¶ 88-117 at 40-51).

    **1.   The prosecution invited the jury to speculate on inadmissible evidence during the guilt phase**.   (Doc. 17, ¶¶ 91-93 at 41-42).

    **2.   The prosecution misstated the law during the guilt phase**.   (Doc. 17, ¶¶ 94-96 at 42-43).

The court shall address subclaims 1 and 2 together because the Alabama Court of Criminal Appeals' opinion intertwines the factual and legal findings of a portion of those claims.

        **a.**   *General statements concerning evidence and the role of a prosecutor.*

Mason complains that, during closing argument, the district attorney improperly "impl[ied] that mere legal technicalities kept substantive evidence from the jury, and invit[ed] the jury to

speculate about non-record information[]" by stating generally "that there are limitations imposed . . . regarding the admission of certain evidence."  (Doc. 17 at 41) (citing R. 1400-1401).  He also made a general misstatement of the law when he informed the jury that his position is such that he has a "' dual function'" to represent the people of the Alabama and the defendant.  (*Id.* at 42) (quoting R. 1401)).  Mason declares "a reference to the prosecution representing the accused is improper. . . . [and] prejudicial because it divests from the jury the idea that the proceeding is adversarial, effectively asking the jury to consider the prosecution's evidence." (*Id.*).  Mason does not dispute that trial counsel made no objection to the prosecutor's argument.

Respondent asserts that Mason cannot show the state courts' rejection of these claims is contrary to or an unreasonable application of clearly established federal law, or an unreasonable interpretation of the facts in light of the evidence before it.  (Doc. 24 at 30-34).

The Alabama Court of Criminal Appeals' opinion on these issues reads:

> The appellant contends that the district attorney "made numerous impermissible comments to the jury."  (Appellant's brief, p. 14.)  Specifically, he maintains that the district attorney improperly stated to the jury that there are "limitations imposed on the State in criminal trials regarding the type of testimony that is admissible."  He claims this comment "clearly invited the jury to speculate about non-record information." (Appellant's brief, p. 14.)  He also alleges that the district attorney improperly argued that he represented the accused.  In support of his contentions, he refers this court to the following portion of the district attorney's closing argument in rebuttal:

>> "As I said earlier in this case, I'm not the State of Alabama. . . .  The State of Alabama is everyone in this courtroom, everyone who is a citizen of this community, of this county, and of this state, we are the State of Alabama.  I represent you in this trial, that's my job.  That's Ms. Hall's job.

>> "Mr. Ferguson and Ms. Ferguson represent the defendant. They were retained by he or his family to represent him, and it's their job to come in here and give him the best representation that they can.

"Now, the reason I bring this up is that because I represent the State of Alabama and this defendant is a part of or a citizen of this community, Ms. Hall and myself in some way also represent him. And because of that fact, the law says and the rules that have been developed over the years by our Supreme Court and our legislature, dictate . . . what we can and cannot do in a criminal trial.  And I know-or I suspect-I don't know, but I suspect that at some point during your deliberations, one or more of you will say to another one, 'Well, why didn't the State do this?' or 'Why didn't the State, the State's Attorney, say this?  Why didn't they ask that witness this particular question?  Why didn't they elicit this particular response to that question?  Why didn't they produce into evidence and give us to examine a particular piece of evidence?'  Well, if that question arises or any of those questions arise, that is your answer.  We are limited by the rules of evidence, the rules of this court, and the laws of the State of Alabama.  Because we function or serve a dual function and part of that being we, in some way, represent the defendant.  So we have to be sure, as best we can, that this defendant gets a fair and impartial trial.   So if any of you, during your deliberations, happen-that question comes up, 'Why didn't the State do this? Why didn't he say this?  Why didn't she say that?' that may be the answer for your question.  Please keep that in mind, we do have these rules. Ms. Hall and I have no quarrel with those rules.  I have been doing this some twenty-odd years, and people before me a couple of hundred years, have been operating under these same rules.  So we don't have any quarrel with them.  They are good rules, they make our system work.  But I wanted you to understand that the State, the prosecutor, is limited because of this dual role, this dual function and because of these rules that are made to make sure that a person charged with a crime gets a fair trial."

(R. 1399-1402.)

When the comments are examined in context, it is clear that the district attorney was explaining to the jury that while his function was to represent the State of Alabama, he also had an obligation to ensure that the appellant received a fair trial, and in fulfilling that obligation, he was bound by evidentiary rules.  The district attorney was not inviting the jury to speculate about nonrecord evidence.  On the contrary, the district attorney was cautioning the jury that it should not speculate about matters that were not in evidence.  We find no plain error in the district attorney's remarks.

*Mason v. State*, 768 So.2d 981, 991-92 (Ala. Crim. App. 1998).

The Alabama Supreme Court affirmed the decision of the Alabama Court of Criminal Appeals, and made its own findings as to the prosecutor's comment on his 'dual function':

> These statements were improper and objectionable. Had the defendant objected, the trial court would have been obliged to sustain the objections and to take curative action.

> In context, however, the essence of the prosecutor's argument was that, because he represented everybody in the community, he owed duties not only to prosecute the case vigorously but also to treat the defendant fairly. This description of his duties was correct. *Davis v. State*, 494 So.2d 851, 853 (Ala. Crim. App.1986); *Sprinkle v. State*, 368 So.2d 554, 561 (Ala. Crim. App.1978), writ quashed, 368 So.2d 565 (Ala.1979); *Gallant v. State*, 167 Ala. 60, 63, 52 So. 739, 741 (1910). In context, this argument does not warrant relief under the plain-error rule.

*Ex parte Mason*  768 So.2d 1008, 1012 (Ala.,2000)

Respondent correctly argues that Mason's petition[23] fails to cite authority to support his contention that the district attorney's general comments concerning evidentiary rules and the prosecutor's due process obligations were improper much less prejudicial under United States Supreme Court precedent. (Doc. 25 at 49, 54). Nor does Mason attempt to provide any such support in his reply brief. (Doc. 35 at 54-58). In light of the reasoned opinions of the state courts on the subject, and Mason's failure to show that the decisions are contrary to or an unreasonable application of clearly established federal law, or an unreasonable interpretation of the facts in light of the

---

[23]/ In the prefatory paragraphs of the overall prosecutorial misconduct claim, Mason generally cites *United States v. Rojas*, 731 F.2d 707, 710 (11th Cir. 1984), for the proposition that the Eleventh Circuit's "test for assessing a prosecutor's comments for reversible error is (1) whether the remarks were improper; and (2) whether they prejudicially affected the substantive rights of the defendant. (Doc. 17 at 40-41). He also writes, "*United States v. Garza*, 608 F.2d 659, 666 (5th Cir. 1979)(prosecutor's introduction of his own personal opinion, suggestion of the existence of information beyond that presented at trial to support his witness's credibility and use of status and influence of entire government investigatory apparatus to bolster the believability of case affected substantial rights of defendant." (*Id.* at 41). Mason never applies either case to Claim E.1 or E.2.

evidence, Mason cannot show that he is entitled to 28 U.S.C. § 2254(d) relief and these claims are due to be denied.

      **b.**    *Comments about specific evidence and admissibility.*

      **1**.    *Excluded fiber evidence.*

Mason claims  District Attorney Morgan improperly referred to excluded evidence by stating, "'the fibers, by the way, that were recovered from the body, we offered and defense objected, as they have a right to do, and the Judge ruled that they are not admissible and they are not in, so you don't have them.'"  (Doc. 17, pp. 41-42) (quoting R. 1432)).

In his reply brief, Mason suggests that

> this argument was particularly prejudicial because: 1) it suggested that evidence was being hidden from the jury by the defense; 2) it invited the jury to speculate that the evidence must have supported the prosecution if the defense objected to it; and 3) the prosecution had only moments before argued that the fibers had been left on the victim when Mr. Mason tried to rape her as "he tried to pry her legs apart, perhaps with his elbow, causing this bruise, rubbed up against her perhaps causing the fibers[24] on her left leg."  (R. 1348).  Reference to non-admissible evidence can be cause for reversal.  *United States v. Pariente*, 558 F.2d 1186, 1189 (5th Cir. 1977)(reversing conviction where prosecutor referenced an alleged sworn statement made by defendant and because the jury may have believed the evidence showed the defendant's guilt but was not introduced because of a legal technicality).

(Doc. 35 at 55-56).

The argument sequence at the close of the guilt phase of trial was as follows: Assistant Attorney Karen Hall delivered the prosecution's initial statement, which included the rape comment quoted above.  The court notes that Mason has never before proffered Hall's sexual assault argument

---

[24]     While Assistant District Attorney Hall conceded the fibers did not match clothing seized from the defendant, she also stated she believed the police had seized the wrong clothing from Mason in that they had retrieved clothing he had worn to church earlier in the hours before the murder, and not the clothes he was wearing during the murder.  (R. Vol. 8 at 1343, 1348).  She also indicated she developed this belief from portions of Mason's own statement as to his activities and whereabouts on the day preceding the crime.

to establish that he was prejudiced by District Attorney Morgan's comment.  Defense counsel then

made its closing argument, and  District Attorney Morgan's fiber argument occurred during rebuttal.

In any event, during its closing, defense counsel pointed out that investigators had chosen not

to test either a shirt or smock that appeared to have blood on it and had not tested any Caucasian

hairs recovered from the scene.  (R. Vol. 8 at 1365-66).  Counsel also inferred that officers removing

the body at the scene of the crime were not careful about cross-contamination, arguing

> They stated they put the sheet on the floor [to remove the body], didn't say
> anything about how many hairs were on it, if the bathroom door was opened at the
> time.  They state there's other investigators there, numerous people in and out, and
> they remove the body.
>      Now, at that time they said there was some fibers.  Ladies and gentlemen,
> what that has to do with it, I don't know, either.  They state there some type of pink
> fibers.

(R. Vol. 8 at 1368).

It is against this backdrop that District Attorney Morgan's comment was examined for

impropriety by the Alabama Court of Criminal Appeals:

> The appellant again suggests that a comment made by the district attorney
> during his rebuttal closing argument inappropriately "invited the jury to speculate on
> evidence not admitted in the trial." (Appellant's brief, p. 15.) Specifically, he argues
> that the district attorney committed reversible error when he told the jury that the trial
> court had sustained defense counsel's objection to the admission of fibers into
> evidence and then stated, " 'so you don't have them.' " (Appellant's brief, p. 14-15.)

> The district attorney argued, in pertinent part:

>> "What about these hairs and everything that was collected at
>> the scene?  [Defense counsel] made some issue about why the
>> Caucasian hairs were not compared to someone else.  Well, I submit
>> to you that in this case, very soon after this crime was committed,
>> Huntsville Police Department had developed a suspect, and very
>> shortly thereafter, within a couple of days, as I recall, he was arrested

and made a statement that is contained in [Investigator] Bud Parker's report, which effectively eliminated anyone else as a suspect in this case.  So the detectives who handled this case, I'm sure-and I haven't asked them this-didn't see the need to go on and search further for a suspect.  We have got a guy who has confessed.

"Besides that, as I recall, none of these hairs were compared to any known head hair, pubic hair, body hair, or otherwise, until sometime this year, which is about a year after the crime was committed.  So during that period of time we have had all of those hairs, fibers - the fibers, by the way, that were recovered from the body, we offered and defense objected, as they have a right to do, and the Judge ruled that they are not admissible and they are not in, so you don't have them.  But if we had found any other trace evidence that had any bearing on this case, either pointing towards the defendant's guilt or his innocence, we would have brought them to you.

"As a matter of fact, the law requires us to let the other side know everything that we have, and we did in this case."

(R. 1431-1433.) (Emphasis added to highlight the portion the appellant finds objectionable.)

"[T]he prosecution must avoid statements that suggest to the jury that there exists evidence of a defendant's guilt that was not placed before the jury. . . ." *Roberts v. State*, 735 So.2d 1244 (Ala. Cr. App.1997).  When the comment alleged to be inappropriate is examined in context, it is clear that the prosecution was not suggesting that there was other evidence of the appellant's guilt.  On the contrary, the prosecutor informed the jury that there was no additional evidence.  Furthermore, although the actual fibers were not admitted into evidence, the jury was aware of the existence of the fibers because of the testimony from the trace evidence technician. The technician testified that the fibers had been collected from the thigh and calf area of the victim's leg, and that the fibers were not consistent with the victim's clothing. Accordingly, the prosecutor's reference to the fact that the trial court sustained defense counsel's objection to the admission of the actual fibers does not rise to the level of plain error.

*Mason v. State*, 768 So.2d 981, 993-94 (Ala. Crim. App. 1998).

After careful examination of the parties' arguments, and the opinion of the Alabama Court

of Criminal Appeals, this court finds that Mason has failed to show that he is entitled to habeas

relief.  The jury was aware of the fibers because the evidence technician testified that the fibers found on the victim's body did not match either the victim's clothing or Mason's confiscated clothing.  The jury listened to defense counsel cross-examine state witnesses regarding cross-contamination of the crime scene, a theme carried through by the defense during its closing argument.  Morgan did not improperly comment on inadmissible evidence.

Even if Morgan's comment was impermissible, Mason's detailed confession to the murder along with the admissible physical evidence tending to corroborate that confession destroys any possibility that he could establish the requisite prejudice necessary to entitle him to habeas relief.[25]  For the foregoing reasons, this claim is due to be denied.

2.    *The confidential informant*

Mason alleges the prosecutor misstated the law when she argued, without objection  "You must simply take, because it has been held admissible, the information that [Quincy] provided, as a underline_matter of law."  (Doc. 17 at 43) (quoting (R.1342) (brackets and underline by petitioner)).[26]

---

[25]    Until the filing of the reply brief in this habeas action, Mason has never specifically argued or complained that Hall's comment should be considered as support for the prejudice prong regarding Morgan's comment.  In fact, on direct appeal and in this habeas action, the two arguments have always been listed and treated as separate claims.  Mason alleges that Hall's rape argument was improper because it was based on her personal belief and opinion, when there "there was absolutely no evidence in the record to support [the] position." (*See* (C.R. Vol. 12, Tab. 34 at 13) and *infra., Claim E.4).  On the other hand, Mason alleges Morgan's fiber comment was improper because it "invited the jury to speculate on evidence not admitted in the trial." (*Id.* at 14-15).

Even so, and even if Hall's opening comments, when combined with Morgan's comment, bootstrapped Morgan's argument into the realm of impropriety by suggesting to the jury that law enforcement officials seized the clothing Mason was actually wearing on the night of the crime, the fibers would have matched those clothes, the overwhelming evidence against Mason shows that he was not so prejudiced by the reference that his trial was rendered fundamentally unfair.

[26]    In his reply brief, Mason also suggests, for the first time, that the prosecutor's comment constitutes improper vouching. (Doc. 35 at 50).  This claim is procedurally defaulted and will not be considered.

Respondent declares that Mason cannot show the decision of the state court is contrary to or

an unreasonable application of clearly established federal law.  (Doc. 24 at 32-34).

The Alabama Court of Criminal Appeals examined the claim and made the following

findings of fact and conclusions of law:

> The appellant also argues that the assistant district attorney inappropriately "argued to the jury that they must take the information provided by the confidential informant 'as a matter of law,' a comment that, he claims, "is a clear misstatement of the law, and was calculated to mislead the jury."  (Appellant's brief, p. 14.)
>
> During her closing argument, the assistant district attorney argued:
>
> > "In his opening, [defense counsel] stated a number of things, the most glaring of which I believe to be incorrect, was that the confidential informant was told by the uniformed officer there at the scene what type of weapon was used.  I think it's important that I cover that with you.  I don't necessarily believe this, but studies show that some jurors-or most jurors make up their mind about a case, I think they said 82% of all jurors make up their minds after the opening statements, and they are not supposed to do that.  And I hope that you have not done that.  Because part of what was said by [defense counsel] was glaringly incorrect.  And I hope that as he comes before you in his closing argument, he will admit that the statements he made about the confidential informant were in fact, and are in fact, incorrect.
> >
> > "Investigator Renfroe told you that Officer Miller did not tell this suspect [sic] what type of weapon they were looking for, that Officer Miller did not know the caliber of the weapon they were looking for.  And Officer Miller would have testified, but by agreement we didn't bring him in and put him on the stand; we allowed him to testify as to what Officer Miller would say.  There is no dispute about that.  And I think [defense counsel] will acknowledge that - that Officer Miller did not know what type of weapon was used and he did not tell this informant.
> >
> > "Now, as a matter of law, information provided by a confidential informant is admissible, and, if proven to be reliable, which it was in this case, then the identity and certain other legal things must happen, but because you were allowed to receive that

confidential informant's information, it was in fact admissible, and because it was admissible and because it had been discussed by the parties and with the Judge and the law had been reviewed, the identity of this informant did not-does not and will not ever have to be revealed.

"Investigator Renfroe told you that when he was approached by this young man, he did so on the condition of anonymity, he wanted to remain confidential. Investigator Renfroe told you from the stand that to this day his identity remains confidential. It's known to the parties that need to know, but to the finders of the fact, *you must simply take, because it has been held admissible, the information that the confidential informant provided, as a matter of law*.

"This confidential informant, who is obviously known to the defendant, perhaps even a close friend of this defendant, said that he came to Investigator Renfroe because this young man, Derrick Mason, was out of control and wanting to make a name for himself on the streets."

(R. 1340-42.) (Emphasis added to highlight the portion the appellant finds objectionable.)

The allegedly inappropriate comment cannot be viewed in isolation, but rather should be viewed in the context in which it occurred. From our review of the record, it appears that the prosecutor's comments were directed toward statements made by defense counsel in opening arguments - in an apparent attempt to discredit the informant - that implied that the informant had learned from a police officer at the crime scene what type of weapon was involved. In her closing argument, the prosecutor reminded the jury that Investigator Renfroe testified that neither he nor Officer Miller had told the informant what type of weapon was involved. The prosecutor then told the jury why Officer Miller was not called to testify. The comment the appellant finds objectionable occurred as the prosecutor was explaining to the jury why the confidential informant had not been called to testify at trial.

When the allegedly objectionable comment is viewed in the context of the entire closing argument, it is apparent that the prosecutor was not telling the jurors that as a matter of law they had to believe the truth of what the informant said; rather, the prosecutor was explaining to the jury that as a matter of law the state was not required to reveal the identity of the informant. While perhaps the prosecutor's argument could have been clearer, we do not think the comment " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process' "

*Burton*, 651 So.2d at 651, quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), especially in light of the fact that the trial court thoroughly instructed the jury that the testimony regarding what the informant said was not offered to prove the truth of what the informant is alleged to have said, but rather, it was offered to explain the sequence of events that followed from the officer's conversation with the informant. (See Part V of this opinion for a more detailed discussion regarding the admissibility of the information conveyed by the informant.) Finally, we note that the jury was cautioned many times that statements made by the attorneys were not evidence. Accordingly, the prosecutor's comment does not rise to the level of plain error.

*Mason v. State*, 768 So.2d 981, 990-991 (Ala. Crim. App. 1998).

The Alabama Supreme Court affirmed the appellate court decision.  *Ex parte Mason*, 768

So.2d 1008, 1011-1012 (Ala. 2000).

. . . .  The petitioner . . . complains that the trial court allowed the assistant prosecutor to argue, without objection by the defendant, that, "you must simply take, because it has been held admissible, the information that the confidential informant provided, as a matter of law."

The informant's out-of-court declarations had been offered, without objection, for the dubious purpose of showing why the officer conducted his investigation and expressly not for the purpose of proving the truth of the matter stated. Likewise, the trial court had admitted this testimony expressly subject to these limitations. The out-of-court declarations would have been inadmissible hearsay for the truth of the matter stated. Rule 801 C; C. Gamble, McElroy's Alabama Evidence, § 242.01(2) (5th ed. 1996). Thus, to the extent that the assistant prosecutor's remarks can be construed as arguing the out-of-court declarations for the truth of  the matter stated, the argument was improper.

. . . [T]he prosecutor's argument about them can [not] work a reversal, however, unless the defendant suffered enough prejudice to meet the standards of the plain-error rule. Rule 45, Ala. R.App. P. . . .

The defense may have intentionally allowed the admission of the out-of-court declarations of the informant in order to reap the mitigating benefit of the informant's statement that the defendant was "out of control." Indeed, at the sentencing phase, the defense did argue the sixth statutory mitigating factor-that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." (Emphasis added.) Section 13A-5-51, Ala.Code 1975.

Moreover, rulings by the trial court either excluding the informant's out-of-court declarations or prohibiting the prosecutor's argument regarding the declarations could not have substantially increased the likelihood of either an acquittal or a life-without-parole recommendation. The State's evidence against the defendant was chiefly that the authorities had seized the murder weapon from the defendant's possession and that the defendant had given a detailed confession describing not only the murder itself but also the defendant's bizarre and cruel conduct culminating in the murder. Two police officers observed and heard the confession and recounted it to the jury with enough consistency to impart great credibility to their testimony and, indeed, just enough inconsistency in some details to prevent their testimony from being suspect as the product of improper collaboration. The out-of-court declarations by the informant pale into insignificance in comparison with this other damning evidence. Furthermore, the trial judge expressly instructed the jury not to consider the informant's out-of-court declarations for the truth of the matter stated. Thus we do not find prejudice that would warrant relief under the plain-error rule.

*Ex parte Mason*, 768 So.2d 1008, 1011-1012 (Ala. 2000).

The factual findings of the state court are presumed to be correct and Mason has offered no clear and convincing evidence to the contrary. As such, regardless of the propriety of the prosecutor's comments, Mason simply cannot establish he was prejudiced by them because the evidence against him was plenteous. For the foregoing reasons, Mason cannot establish that he is entitled to habeas relief. This claim is due to be denied.

3.     **The prosecution improperly bolstered the testimony of the State's witnesses during the guilt phase.** (Doc. 17, ¶ 97 at 43).

Mason alleges the prosecutor improperly vouched for the credibility of Bud Parker when she said Parker had " 'interviewed and taken statements from numerous defendants' and had 'testified any number of times in a court of law which led to convictions of defendants based on those statements.' " (Doc. 17 at 43)(citing (R. 1440); *United States v. Hall*, 419 F.2d 582 (5th Cir. 1969);

*Garza*, 608 F.2d at 666.  Moreover, "there had been no reference at trial to Detective Parker's - or any other law enforcement officer's - record of convictions. . ."  (Doc. 35 at 51).

Respondent answers that Mason cannot show the state courts' rejection of this claim on direct appeal was contrary to or an unreasonable application of clearly established federal law or based upon an unreasonable interpretation of the facts in light of the evidence before it.  (Doc. 24 at 34-36.)

The Alabama Supreme Court affirmed the Alabama Court of Criminal Appeals rejection of this claim, and added:

> [T]he petitioner complains that the trial court allowed the prosecutor to argue, without objection, in pertinent part:
>
>> "Whether or not any of these officers use a form, a waiver of rights form, is another smoke screen.  Absolutely no bearing on this case.  If you believe Officer Parker, Detective Parker, one of the most experienced homicide investigators we have got, one who has investigated hundreds of homicide cases in his career, who has interviewed and taken statements from numerous defendants, who has testified any number of times in a court of law which led to convictions of defendants based on those statements, if you don't believe what he told you that the defendant told him, so be it. But whether or not he used a form called a waiver of rights form has absolutely nothing to do with the truth of his testimony."
>
> The prosecutor's comments about the number of statements taken and the number of convictions obtained by Detective Parker in other cases were completely outside the record and were, accordingly, improper and objectionable.  *Smith, supra; Brown, supra.*  By this argument, the prosecutor sought to bolster the credibility of Detective Parker's testimony recounting the defendant's confession.  As already discussed, however, Detective Parker's testimony about the confession had already been corroborated by the consistent testimony of another officer, Lisa Hamilton.[27] Moreover, as already discussed, the trial court instructed the jury, upon a number of occasions, that the arguments of counsel did not constitute evidence and the jurors should not consider counsel's arguments as evidence.  Thus, here again, the improper argument does not warrant relief under the plain-error rule.

---

[27]  Lisa Hamilton also "observed and heard the confession and recounted it with enough consistency to impart great credibility to their testimony. . ."  (*Id.* at 1012).

*Ex parte Mason*, 768 So.2d 1008, 1013 (Ala. 2000).

Mason is not entitled to habeas relief.  While Mason offers case law to support his contention that the prosecutor's argument was improper, he never asserts in any fashion factual or legal arguments regarding an alleged prejudice.  He offers nothing upon which to base a conclusion that the Alabama Supreme Court's well supported and well reasoned prejudice analysis is contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence before it.  This claim is due to be denied.

    **4.**    **The prosecution argued facts not in the record during both the guilt and penalty phases.**  (Doc. 17, ¶¶ 98-102 at 43-46).

        **a.**    *Lack of fingerprint evidence.*

Mason alleges the prosecutor "attempted to explain a lack of fingerprint evidence by [improperly] referring to [statistical] facts that had not been established at trial, [in that she stated] without any authority or support in the record that police only find fingerprints in " 'one out of 20 or 25 cases.' " (Doc. 17,¶ 98 at (quoting (R. 1431) and citing *United States v. Childress*, 58 F.3d 693, 716 (D.C. Cir. 1995) for the proposition that "prosecutor's statement that drug operation was largest in history of District was improper where no evidence had been introduced to support that factual allegation.")).

The Alabama Supreme Court affirmed the Alabama Court of Criminal Appeals' rejection of this claim.  Its opinion reads:

        The petitioner further complains that the trial court allowed the prosecutor to argue, without objection, and entirely outside the record, that identifiable fingerprints could be recovered in only "one out of twenty or twenty-five cases."  The purpose of this argument was obviously to refute the defendant's argument that an absence of his identifiable fingerprints at the scene of the crime indicated that he had not been present.  Of course, the prosecutor's resort to fingerprint statistics entirely outside the

> record was improper.  Had the defendant objected, the trial judge would have been obliged to sustain the objection.  *Smith v. State*, 588 So.2d 561 (Ala. Crim. App.1991); *Brown v. State*, 374 So.2d 391 (Ala.Crim.App.), *aff'd,* 374 So.2d 395 (Ala. 1979). Indeed, the trial judge did, on a number of occasions, instruct the jurors generally that the arguments of counsel did not constitute evidence and that the jurors should not consider the arguments as evidence.
>
> Here again, the question is whether the improper argument prejudiced the defendant enough to warrant relief under the plain-error rule.  Without the prosecutor's fingerprint statistic argument outside the record, would the jurors have been substantially more likely to conclude that the absence of fingerprints identifiable as the defendant's at the scene of the crime exonerated him?  His confession and his possession of the murder weapon eclipse any such likelihood.

*Ex parte Mason*, 768 So.2d 1008, 1013 (Ala. 2000).

Like his previous argument, Mason does not identify a factual construct or legal argument establishing prejudice, nor an argument that the state court's well supported and well reasoned prejudice analysis is contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence before it.  This claim is due to be denied.

**b.**     *Dr. Embry's testimony regarding fingerprints.*

Next, Mason alleges the prosecutor referred to non-record facts to bolster state pathologist Joseph Embry's testimony when she argued:

> "What [Dr. Embry] said was 'We tried to lift prints off the body.'  But I'll tell you that after reviewing the evidence, what they did was take that black powder and place it all over her body trying to lift prints and there were none."

(Doc. 17, ¶ 99 at 44 (quoting (R. 1344)).

Respondent answers that this claim is procedurally defaulted because it was not raised at trial, on appeal, or during post-conviction proceedings.  (Doc. 24 at 38) (citing *Teague v. Lane*, 489 U.S. 288, 297-98 (1989); *Engle v. Isaac*, 456 U.S. 107, 113-114, 117, 124-125 (1982).  A review of the

record shows that respondent is correct.  Since Mason was required to but failed to afford the state courts an opportunity to address this claim to such an extent that the state's procedural rules prevent any further presentation of it, it is procedurally defaulted.

        **c.**    *Arguing that defendant tried to rape the victim.*

Mason alleges that the prosecutor "improperly argued that [he] tried to rape the victim, without any evidence in the record whatsoever to support this position, [because she stated] 'Do I think he raped her?  I don't know.  But what I do think is that he at least tried.' "  (Doc. 17, ¶ 100 at 44 (quoting R. 1347-48)).  He then argues that "[a]ny reference to non-record information during closing is error." (*Id.*)( citing *Berger v. United States*, 295 U.S. 78, 84-85 (1935)).  He contends this is "particularly true where the improper argument acts to arouse the passions of the jury, such as the allegations of sexual assault . . . when the issue of race is interjected[.]"

Respondent contends that Mason cannot show he is entitled to 2254(d) relief from the decision of Alabama Court of Criminal Appeals on direct appeal.  (Doc. 24 at 39-40).  That opinion reads:

> We find no error in the portion of the prosecutor's argument where she stated that the appellant might have tried to rape the victim. The prosecutor argued:
>
> > "Do I think he raped her? I don't know. But what I do think is that he at least tried.  There is no other explanation for having this woman be so completely humiliated with all of her clothes off.  There is no other explanation for the pubic hair consistent with hers in his [sic].  There is, to me, some indication that it occurred by virtue of the fact that here on her upper left leg was a bruise, that on this left leg were found some fibers of clothing not consistent with his [sic].  I will always believe that as she sat there on that desk trying to protect her virtue, he tried to pry her legs apart, perhaps with his elbow, causing this bruise, rubbed up against her perhaps causing the fibers on her left leg, and that as he tried to make entry he left that pubic hair in hers."

(R. 1347-1348.)  When the victim was found, she was wearing only her socks, she had a fresh bruise on her inner thigh, and a negroid pubic hair consistent with the appellant's was found in her pubic hair.  In addition, material fibers not consistent with her clothing were found on her inner thigh.  Testimony established that the fibers could have been deposited on the victim by someone rubbing against her. There was evidence that the victim's shirt had been forcibly removed from her body. Furthermore, the appellant admitted to the police that he forced the victim to remove the rest of her clothes.  Accordingly, we conclude that the prosecution's argument is a legitimate inference from the evidence presented.

*Mason v. State*, 768 So.2d 981, 989-990 (Ala. Crim. App. 1998).

The state court's findings of fact are entitled to a presumption of correctness, and Mason's blanket assertion that there was no evidence to support the prosecutor's sexual assault argument does not begin to provide the clear and convincing evidence required to overcome the presumption.  The prosecutor's argument was a legitimate inference from the evidence.  Moreover, the race of the perpetrator was material, and the sexual overtones of the crime were apparent.  Neither fact was afforded an underlying inflammatory emphasis by the prosecutor.  This claim is due to be denied.

     **d.**    *Misstating Dr. Embry's testimony regarding the first and second bullets*.

Mason next argues that "during the sentencing phase, the prosecutor erroneously stated that Dr. Embry testified " 'that the first shot Ms. Cagle received entered the left cheek, exited the back of the left - behind the ear.' In fact, Dr. Embry testified that he could not tell which of the two bullet wounds occurred first, or which wound killed Ms. Cagle.  (R. 1074)."  (Doc. 17, ¶ 101 at 45) (quoting (R. 1605 and 1074 respectively).  Mason argues that this statement was especially prejudicial to jury and judge because it was used to argue that the killing was heinous, atrocious, or cruel, and the trial judge used the mischaracterization in  finding that the murder was indeed heinous, atrocious, or cruel.  (R. 1605-16).  (*Id*. at 45).

Respondent answers that this claim is procedurally defaulted because it was not raised at trial, on appeal, or during post-conviction proceedings.  (Doc. 24 at 41) (citing *Teague v. Lane*, 489 U.S. 288, 297-98 (1989); *Engle v. Isaac*, 456 U.S. 107, 113-114, 117, 124-125 (1982).  A review of the record shows that respondent is correct.  Since Mason was required to but failed to afford the state courts an opportunity to address this claim to such an extent that the state's procedural rules prevent any further presentation of it, it is procedurally defaulted.

>    **e.**    *Prosecutor stated Mason wanted to write a book.*

Mason alleges that, at sentencing, the prosecutor inflamed the jury with facts not in evidence by arguing "'[a]nd like all of the modern day criminals, he wants to write a book, wants to profit from what's happened to him and the horror and the tragedy he has inflicted on another family, including his own family." (Doc. 17 at  45)(quoting R. 1629).  Mason asserts there was no evidence he intended to write such a book.

Respondent answers that this claim is procedurally defaulted because it was not raised at trial, on appeal, or during post-conviction proceedings.  (Doc. 24 at 41) (citing *Teague v. Lane*, 489 U.S. 288, 297-98 (1989); *Engle v. Isaac*, 456 U.S. 107, 113-114, 117, 124-125 (1982).  A review of the record shows that respondent is correct.  Since Mason was required to but failed to afford the state courts an opportunity to address this claim to such an extent that the state's procedural rules prevent any further presentation of it, it is procedurally defaulted.

>    **5.**    **The prosecution improperly stated personal opinions during guilt phase.**  (Doc. 17, ¶¶ 103-105 at 46-47).

Mason alleges that the prosecutor made arguments concerning her personal opinion, and argues that "personal beliefs are always improper because the beliefs are based on non-record

information, which is always <u>error</u>." (Doc. 17 at 46)(citing *Berger*, 295 U.S. 84-5). The statements

read:[28]:

 a.   "I believe. . . that he went to the store earlier, bought some gas, checked it out, saw her, determined she was alone, came back and parked his car on this side, the darkest side, entered this store with the intent to rob, takes her in the back room." (R. 1339).

 b.   "I believe that as he held the gun over her a second time, because he didn't want to leave any witnesses, didn't want anyone to identify him, as he shot her at close range the second time in the right side of her check, the projectile flew out and landed here in this box." (R. 1340).

 c.   "Do I think he raped her? I don't know. But what I do think is that he at least tried." (R. 1347-48).

 d.   " I will always believe that as she sat there on that desk trying to protect her virtue, he tried to pry her legs apart, perhaps with his elbow, causing this bruise, rubbed up against her perhaps causing the fibers on her left leg,[29] and that as he tried to make entry he left that pubic hair in hers." (R. 1348).

 e.   ["]I believe that as they got into the back room, and there were no cameras, that perhaps he decided maybe I will have a little fun here. I believe that before any of the sexual activity, if any occurred, happened, that he did step outside to see if any cars had stopped for gas.["] (R. 1348-49).

 The last court to address this claim on direct appeal was the Alabama Supreme Court. Its

opinion reads:

 In arguing to the jury, the assistant prosecutor prefaced many of her statements with such expressions as "I believe" and "I think," without objection by the defense. The petitioner now argues that the assistant prosecutor was thereby arguing matters outside the record. Because the substance of the assistant prosecutor's statements was supported by evidence introduced during the trial, the comments were not objectionable as references to matters outside the record. Such first-person prefaces as "I believe" and "I think" should, however, be avoided

---

[28]/   Mason claims the prosecutor expressed her personal beliefs "[o]n at least fourteen different occasions," and places record citations in footnote. Such citations to the record fails to satisfy the heightened pleading requirements for habeas proceedings and, as such, only those comments Mason has set out in full shall be examined.

[29]/   At this juncture, Mason placed footnote 5, which reads: "The fibers had been ruled inadmissible."

inasmuch as they may be construed as the advocate's personal voucher for the truth of the evidence, an improper practice.  *See Woods v. State*, 19 Ala.App. 299, 97 So. 179 (1923), rev'd on other grounds, 20 Ala.App. 200, 101 So. 314 (1924), aff'd, 21 Ala.App. 436, 109 So. 171 (1926); and *Arthur v. State*, 575 So.2d 1165 (Ala. Crim. App.1990).  *But see Williams v. State*, 710 So.2d 1276 (Ala. Crim. App.1996), aff'd, 710 So.2d 1350, cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998); and *Coral v. State*, 628 So.2d 988 (Ala. Crim. App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994).

> In the particular case before us, the assistant prosecutor's continual use of these first-person prefaces tends to diminish the force of her argument rather than to increase it.  The evidence in this case was so emotionally compelling that its impact would have been greater had it been argued as established fact instead of personal belief.  Thus, in the context of the particular facts of this case, the use of these first-person prefaces did not prejudice the defendant, much less prejudice him enough to entitle him to relief under the plain-error rule.  *See e.g. Williams*, *supra; Ex parte Rieber*, 663 So.2d 999 (Ala.1995), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995); and *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).

*Ex parte Mason* , 768 So.2d 1008, 1011 (Ala. 2000).

The factual findings made by the Alabama Supreme Court regarding the evidence presented at trial are entitled to a presumption of correctness.  Mason has provided no clear and convincing evidence to overcome that presumption.  Thus, the evidence of Mason's guilt, as set out in this portion of the appellate court's opinion and that court's findings of fact surrounding the crime itself, will be afforded appropriate deference.   Since the trial court found the prosecutor's beliefs were reasonable inferences from the evidence, Mason cannot establish that her attachment of the words "belief" or "think" were improper.  More importantly, the appellate court found that, regardless of the prosecutor's verbal thought processes, the facts of the case showed that Mason was not prejudiced by the remarks.

Mason has not shown he is entitled to habeas relief from the state court's merit review of the case.  This claim is due to be denied.

**6.      The prosecution misstated the roles of both the prosecution and the jury during both the guilt and penalty phases**.  (Doc. 17, ¶¶ 106-108 at 47-48).

In this argument, Mason repeats his complaint regarding District Attorney Morgan's assertion that the prosecutor serves a "dual function," a claim that has already been addressed as part of Claim E.1. (Doc. 17 at 47).  Mason also points out six areas of the prosecutor's argument pertaining to the advisory nature of the jury sentencing verdict.  (*Id.*)( quoting (R. 1621-30)).  Thereafter, he simply concedes each argument  "is a technically correct statement of the law," and asserts "the United States Supreme Court has condemned arguments that diminish the jury's sense of responsibility in the sentencing phase of a capital murder trial."  (*Id.)* (citing *Caldwell v. Mississippi*, 472 U.S. 320, 328-39 (1985).

As Mason has conceded here that the prosecutor's statements were legally correct, the court does not set out the Alabama Court of Criminal Appeals' rejection of the claim in full.  *See Mason v. State*, 768 So.2d at  996-997.  Instead, only that portion of the Alabama Court of Criminal Appeals' opinion pertaining to the context of the prosecutor's arguments is addressed.  The appellate court found that the district attorney's instruction was a reply to defense counsel's suggestion "several times that the jury had the ultimate authority to determine whether [Mason] lived or died." (*Id.* at 996).  Mason does not dispute this factual finding.  In light of the fact that Mason concedes the prosecutor's advisory comments were a proper statement of the law and does not dispute defense counsel argued otherwise (which could mislead the jury) in its closing, he cannot establish impropriety, much less prejudice.  This claim is due to be denied.

**7.      The prosecution engaged in other misconduct and errors throughout petitioner's trial and appeal.**  (Doc. 17, ¶¶ 109-110 at 48-49).

This underlying allegations in support of this claim were raised for the first time during post-conviction proceedings.[30]  Mason failed to timely appeal from the Rule 32 court's rejection of the claim on collateral appeal.  As such, this claim is procedurally defaulted.

   **8.     Prosecutorial misconduct and error: Conclusion**.  (Doc. 17, ¶¶ 111-117, pp. 49-51).

Although some of the reviewable[31] comments made by the prosecutors in Mason's case during the guilt phase of trial were improper, none, either individually or collectively, are such that Mason's fundamental right to a fair trial was violated.[32]  The evidence of Mason's guilt was overwhelming, and there is no reasonable probability that the jury would have acquitted Mason of the offense if the improper comments had been the subject of an objection.  Mason does not explain how the prosecutor's "dual function" argument, made at the guilt phase of trial, rendered the penalty phase of the trial fundamentally unfair.  This claim is due to be denied.

**F.     The prosecution struck potential jurors solely on the basis of their race in violation of the Sixth, Eighth and Fourteenth Amendments.**  (Doc. 17, ¶¶ 118-124 at 52-53).

This claim is similar to its Rule 32 predecessor.[33]  Mason alleges that, during voir dire, the prosecution utilized its peremptory challenges to strike African-Americans and women in a discriminatory manner.  (Doc. 17 at 52-53)(citing *Batson v. Kentucky*, 476 U.S. [79,] 84 (1986); *Powers v. Ohio*, 499 U.S. 400, 404 (1991); *J.E.B. v. Alabama*, 511 U.S. 127, 128 (1994)).  The post-conviction court addressed the issue as follows:

---

[30]/     *See* (Rule 32 C.R. Vol. 14, Tab.41 at 22).

[31]/     Meaning the prosecutorial misconduct claims that are not found to be procedurally defaulted in this opinion.

[32]/     Those comments that are procedurally defaulted are immaterial and irrelevant to the court's analysis.

[33]/     (*See* Rule 32 C.R. Vol. 14, Tab. 41 at 19-20).

> [Mason] contends that the prosecution used peremptory challenges during the
> striking of his jury in a discriminatory manner based on race and gender. The Court
> finds that the allegation of racial discrimination by the State during voir dire . . . is
> procedurally barred from review because it was raised and addressed at trial and
> because it could have been but was not raised on appeal. (R. 656). Rules 32.2(a)(2)
> and (5) ARCrP. The Court further finds that the allegation of gender discrimination
> during voir dire is procedurally barred because it could have been but was not raised
> at trial and could have been but was not raised on appeal. Rules 32.2(a)(3) and (5)
> ARCrP. Therefore, these allegations are hereby summarily dismissed.

(Rule 32 C.R. Vol. 16, Tab. 55 at 60).

Mason does not dispute that he failed to timely appeal the denial of this post-conviction claim

to the Alabama Court of Criminal Appeals. (Doc. 35 at 40-41). Nor does he deny that he never

presented a *J.E.B* claim on direct appeal. (*Id.*). Accordingly, Mason's *J.E.B.* claim is procedurally

defaulted.

However, he contends that the *Batson* claim is not procedurally defaulted because his

"appellate counsel . . . listed the overruled *Batson* objections in the appellate briefs to the Alabama

Court of Criminal Appeals and the Alabama Supreme Court." (*Id.*). In essence, Mason argues that

the Rule 32 court's denial of the *Batson* claim and his own failure to execute a timely collateral

appeal of that decision is irrelevant because he presented the *Batson* claim in the direct appeal

process. He contends he was not required to raise the question during the postconviction process

in order to preserve it for federal review. Had Mason actually raised such a claim on direct appeal,

his argument would have merit. However, Mason clearly misrepresents the record. Nowhere in any

brief or materials presented on direct appeal did Mason raise a *Batson* claim. He simply attached

a document entitled "List of Adverse Trial Court Rulings to the Briefs", seven of which read:

"Overruled *Batson* challenge" and a page citation to the trial record.[34]   Additionally, Mason at no point complained that he was raising such a claim and the state court had overlooked the effort. Contrary to the misleading assertion made here, Mason did not present a *Batson* claim to the state court during the direct appeal process.  He is bound by the postconviction court's dismissal of the claim on collateral review.

For the foregoing reasons, this court expressly finds that Mason's *Batson*/*J.E.B.* claims are procedurally defaulted.  He was required to but failed to raise the claims at trial and/or on direct appeal in accordance with state procedural rules, and the Rule 32 trial court dismissed the claims based on those failures.  Moreover, his appeal from the postconviction dismissal of the claims was found to be untimely by the Alabama Court of Criminal Appeals, resulting in an additional procedural default.

Mason does assert that, even if this court finds his *Batson* claim to be procedurally defaulted, he can overcome that default because his trial counsel were ineffective for "fail[ing] to preserve the record and litigate the *Batson* claims."  (Doc. 35 at 42).  As an alternate stance, Mason argues "if the Court finds a default due to the actions of appellate counsel, this too can constitute cause." (*Id.*). However, a claim of ineffective assistance must be both exhausted *and* not defaulted in state court before it can be asserted as cause.  *Hill v. Jones*, 81 F.3d 1015, 1030-31 (11th Cir. 1996).  If the ineffective assistance claim is defaulted, then a petitioner must demonstrate independent cause and prejudice excusing the default of the ineffectiveness claim before that claim can be asserted as cause in relation to a second, substantive claim.  (*Id.*).

---

[34]/     (*See generally*, R. Vols. 12 and 13) for the attachments to Mason's briefs in support of his  direct appeal, application for rehearing, and petition for writ of certiorari.

Mason cannot assert the alleged ineffectiveness of trial counsel as cause to overcome the procedural default of this claim because, as noted earlier in this discussion (*see supra* Claim G), the ineffectiveness claim is itself procedurally defaulted.  Mason never raised a claim of ineffective appellate counsel as to this issue at any time during direct or collateral review.[35]  For the foregoing reasons, both Sixth Amendment ineffectiveness claims are procedurally barred.  A procedurally defaulted ineffectiveness claim cannot provide the cause and prejudice necessary to overcome the procedural default of Mason's *Batson* claim.  Accordingly, the *Batson/J.E.B.* claims are procedurally defaulted.

**G**.   **Ineffective Assistance of Counsel.**[36]  (Doc. 17, ¶¶ 125-164 at 53-72).

As a prefatory matter it must be observed that all but a handful[37] of the subclaims in Mason's habeas petition were initially raised in his Rule 32 petition, the denial of which Mason failed to timely appeal as expressly required by Alabama law.   The Alabama Court of Criminal Appeals' dismissed the notice of appeal on the grounds of untimeliness.   Thus, the following claims are procedurally defaulted for federal review purposes:

1.   **Trial counsel failed to conduct an adequate and independent investigation of the State's capital murder charge against petitioner.**  (Doc. 17, ¶¶ 133-137 at 57-59).

2.   **Trial counsel abdicated their responsibility during voir dire.**  (Doc. 17, ¶¶ 138-143 at 59-61).

---

[35]   (*See* Vol. 14, Tab. 41 at 17-18).

[36]   Mason actually titles this claim as "The above errors were exacerbated by the ineffective assistance of trial counsel."  Such a title cannot satisfy Mason's burden to sufficiently plead an independent ineffectiveness claim. As such, only the allegations of ineffective counsel specifically pleaded within the body of Claim G shall be considered.

[37]   ¶¶ 147, 149-151, 153-154.

3.     **Trial counsel failed to adequately challenge the State's investigation and presentation of the case.** (Doc. 17, ¶¶ 144-146, 148 at 61-63).

4.     **Trial counsel failed to object to a number of objectionable occurrences.** (Doc. 17, ¶¶ 152 at 64-66).

5.     **Trial counsel failed to adequately investigate, prepare for and present evidence during the sentencing phase.** (Doc. 17, ¶¶ 155-161, at 66-71).

    a.     **Background and mental health history as mitigating evidence.** (Doc. 17, ¶¶ 160(a) at 69).

    b.     **Failure to show petitioner's mother used drugs and alcohol during pregnancy.** (Doc. 17, ¶¶ 160(b) at 69).

    c.     **Failure to present evidence petitioner had attention deficit disorder and saw a psychologist on several occasions.** (Doc. 17, ¶¶ 160(c) at 69).

    d.     **Failure to present social history experts.** (Doc. 17, ¶¶ 160(d) at 69-70).

    e.     **Failure to present evidence of petitioner's involuntary intoxication**. (Doc. 17, ¶¶ 160(e) at 70).

    f.     **Failure to present expert to testify as to effect of petitioner's involuntary intoxication**. (Doc. 17, ¶¶ 160(f) at 70).

    g.     **Failure to interview and present other witnesses who would have offered substantial mitigating testimony.** (Doc. 17, ¶¶ 160(g) at 70-71).

6.     **Failure to present, adequately argue and obtain favorable ruling on errors during the sentencing phase.** (Doc. 17, ¶¶ 162-164 at 71-72).

The remainder of the omnibus ineffectiveness sub-claims (¶¶ 147, 149-151, 153-154) are subject to 28 U.S.C. ¶ 2254(d) review because they were raised by appellate counsel in a motion for new trial and/or on direct appeal, and the Alabama Court of Criminal Appeals conducted a merits review of the claims.[38]

---

[38]/    The habeas paragraphs being examined in this opinion comport with a version of Mason's entire ineffectiveness claim on direct appeal. *See* (Claim IX. A-E at C.R. Vol. 12, Tab. 34 at 27). Although the Alabama Court of Criminal Appeals noted that Mason did not present all of the ineffectiveness claims in his motion for new trial,

Since the appellate court's opinion addressed the claims collectively, it is appropriate to do so here.  The allegations in support of the sub-claims are:

- **¶¶ 147, 151.** **Trial counsel failed to object to statements of the confidential informant and the trial court's limiting instruction regarding the admissibility of same as a violation of the Confrontation Clause.**

  **Trial counsel also failed to object to the confidential informant's statements on hearsay grounds.**

Mason contends trial counsel were ineffective for failing to object to Detective Renfroe's testimony regarding the confidential informant on the grounds that it violated his Sixth and Fourteenth Amendment constitutional rights, and on the ground the statements were "clearly hearsay." (Doc. 17 at 63).  Nor did counsel object to the court's instruction limiting the purpose for which the hearsay statements were purportedly being admitted.  (*Id.* at 63).

- **¶¶ 149.** **Trial counsel failed to object to improper argument at the guilt and phase of trial.**

Mason alleges counsel failed to object to the prosecutor's improper arguments at the guilt phase of trial, and as his only support therefore he simply writes, "As discussed above, the prosecution was allowed to argue its personal opinions about the evidence, to argue non-record matters, and to improperly vouch for the State's witnesses.  (*Id.*)(quoting *United States v. Wolf*, 787 F.2d 1094, 1099-1100).

---

it acknowledged its obligation to conduct a plain error review.  *See Mason v. State*, 768 So.2d 981, 1005 (Ala. Crim. App.  1998).

- ¶¶ 150.      **Trial counsel failed to object to improper argument at the penalty phase of trial.**

At the penalty phase of trial, Mason complains trial counsel failed to object to the prosecutor's repetitious argument that the jury's verdict was advisory in nature.  (*Id.*) (citing *Caldwell*, 472 U.S. 320, and *Mann v. Dugger*, 844 F.2d 1446 (11th Cir. 1998)).

- ¶ 153.      **Trial counsel was ineffective for stipulating to the admission of evidence.**

Mason alleges that trial counsel "imprudently agreed to stipulate to the admissibility of certain items of evidence[,]" and supports it by complaining that counsel agreed not to challenge the chain of custody "with respect to both items Investigator Glenn Nunley touched or helped bag and the transportation" of the victim's body by the coroner.  (Doc. 17 at 65) (citing R. 1316-1318).

- ¶ 154.      **Trial counsel failed to object to the heinous, atrocious, or cruel instruction**.

This claim reads in its entirety, "Finally, trial counsel failed to object to the jury charge regarding the aggravating circumstance that the crime was especially heinous, atrocious or cruel. As discussed above, there was no evidence in the record to support this charge."  (Doc. 17 at 66).

On collateral appeal, the Alabama Court of Criminal Appeals made the following findings of fact and conclusions of law in connection with the above claims:

> Pursuant to the procedure outlined in *Ex parte Jackson*, 598 So.2d 895 (Ala.1992), [footnote omitted] appellate counsel filed a motion for a new trial, in which counsel asserted, in very general terms, that the appellant had received ineffective assistance of trial counsel.[FN6]  A hearing was conducted on the motion. During the hearing, appellate counsel advanced several of the above grounds in support of the appellant's contention that his trial counsel had been ineffective; however, neither the appellant nor his trial attorneys testified at the hearing.  The trial court denied the appellant's motion for a new trial.
>
> FN6. The appellant was represented by different counsel at trial and on appeal.

Although the appellant did not present all of the above allegations of ineffective assistance of counsel to the trial court, this Court is obliged to review the appellant's allegations pursuant to the plain error doctrine.  Rule 45A, Ala.R.App.P.

> "In order to prevail on an ineffective assistance of counsel's claim, a defendant must meet the two-pronged test set out by *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
>
>> " 'First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.'
>
> "*Id.* at 687, 104 S.Ct. 2052.
>
>> " 'The performance component outlined in *Strickland* is an objective one: that is, whether counsel's assistance, judged under "prevailing professional norms," was "reasonable considering all the circumstances." ' *Daniels v. State*, 650 So.2d 544, 552 (Ala. Cr. App.1994) (quoting *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052).  Once a defendant has identified the specific acts or omissions that allegedly were not the result of reasonable professional judgment on counsel's part, the court must determine whether those acts or omissions fall outside the wide range of professionally competent assistance.  *Id.*
>
> "When reviewing a claim of ineffective assistance of counsel, we indulge a strong presumption that counsel's conduct was appropriate and reasonable.  *Hallford v. State*, 629 So.2d 6 (Ala. Cr.

App.1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994); *Luke v. State*, 484 So.2d 531 (Ala. Cr. App.1985).

" 'Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."  There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.'

"*Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (citations omitted). *See Ex parte Lawley*, 512 So.2d 1370, 1372 (Ala.1987).

"And, even if an attorney's performance is determined to be deficient, the petitioner is not entitled to relief unless it is also established that 'there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.' *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.

"In an ineffective assistance of counsel claim, the burden is on the claimant to show that his counsel's assistance was ineffective. *Ex parte Baldwin*, 456 So.2d 129 (Ala.1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985)."

*McNair v. State*, 706 So.2d 828 (Ala. Cr. App.1997).

The appellant has met neither prong of the *Strickland* test. First, the appellant has not demonstrated that his trial counsel's performance was deficient. As noted, neither the appellant nor his trial attorneys testified at the hearing. The arguments of the appellant's counsel in support of the motion for a new trial are not evidence. *Arnold v. State*, 601 So.2d 145, 154 (Ala. Cr. App.1992). Without more, it is impossible to determine trial counsel's rationale for not objecting to the allegedly improper conduct or comments. Accordingly, the appellant has not " 'overcome the presumption that, under the circumstances, [counsel's actions] "might be considered sound trial strategy." ' " *McNair*, 706 So.2d at 839, quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.

Even if we were to assume for the sake of argument that counsel's performance was deficient, the appellant has not proven that he was prejudiced by counsel's performance. All of the claims underlying the appellant's allegations of ineffective assistance of counsel-with the exception of the claim "D" above-have been addressed elsewhere in this opinion and found to be without merit.[39] Accordingly, the appellant has failed to prove that " 'there is a reasonable probability that, but for [counsel's failure to object], the result of the proceeding would have been different.' " *McNair*, 706 So.2d at 839, quoting *Strickland,* 466 U.S at 694, 104 S.Ct. 2052.

In support of the appellant's allegation that his trial attorneys were ineffective for stipulating to the admissibility of certain evidence, the appellant refers this Court to a portion of the record in which counsel agreed to stipulate to the chain of custody on items of evidence which Investigator Glen Nunley "touched or helped bag." (R. 1317.) In that portion of the record, counsel also stipulated that it was not necessary

---

[39]/   The state court did not specifically address the Confrontation Clause issue as substantive matter on direct appeal. This court's findings are the same whether the ineffectiveness claim is examined *de novo* or pursuant to 2254(d).

The court recognizes that the Alabama Supreme Court engaged in discussion regarding the issues surrounding the confidential informant's statements as hearsay, the prosecutor's comment on the statements during closing, and the performance of counsel that somewhat differed from the Alabama Court of Criminal Appeals with regard to the substantive issues. *See Ex parte Mason*, 768 So.2d 1008, 1011-1012. (Ala. 2000). Nonetheless, that Court also found that even if there had been "rulings by the trial court" excluding the confidential informant's statement or the prosecutor's argument, such a turn of events "could not have substantially increased the likelihood of either an acquittal or a life-without-parole sentence based upon the evidence of guilt against Mason and the cruelty of the murder. (*Id.* at 1012).

The Alabama Supreme Court also disagreed with the Alabama Court of Criminal Appeals in that it found two prosecutorial comments to be improper ( *i.e.* District Attorney Morgan's 'dual function argument, comments regarding fingerprint statistics, and argument concerning Detective Parker's experience taking statements and conviction success rate) because the dual function argument was a misstatement of the law and the remaining were not supported by the evidence. (*Id.* at 1012-13). Nonetheless, the Alabama Supreme Court still determined the improper statements were not so prejudicial as to rise to plain error. (*Id.*).

to have the contract driver for the Department of Forensic Sciences, who transported the victim's body to and from the autopsy, testify as a chain of custody witness, and counsel stipulated to the identity of the deceased.  Other than his broad assertion that there is no evidence that he agreed to the stipulations, and that any such stipulations should be considered ineffective assistance "as a matter of law" (Appellant's brief, p. 29), the appellant does not demonstrate how counsel's stipulations constituted ineffective assistance.  Again, the appellant has failed to overcome the presumption that counsel's conduct fell " 'within the wide range of reasonable professional assistance.' "  *McNair*, 706 So.2d at 839, quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.  Moreover, the appellant does not even say how he was prejudiced by counsel's stipulations, and any prejudice suffered as a result of counsel's stipulations is not apparent to this Court.

Because the appellant has met neither prong of the test set forth in *Strickland*, he is due no relief on his allegations of ineffective assistance of counsel.

*Mason v. State*, 768 So.2d 981, 1005 -1007 (Ala. Crim. App. 1998).

Mason contends that the state court's "summary conclusion that trial counsel's performance must have been sound trial strategy because neither Mr. Mason nor trial counsel testified at a hearing [on the motion for new trial], constitutes an unreasonable application of *Strickland*."  (Doc. 35 at 188).  Mason also declares there is no controlling authority that require trial counsel's testimony to prove ineffectiveness or that a defendant waive his Fifth Amendment rights on direct appeal to testify in support of an ineffectiveness claim.  (*Id.*).

The state court did not decide counsel's actions *must* have been reasonable trial strategy.  Its decision placed emphasis on Mason's failure overcome the *presumption* that counsel's conduct *might have been* sound trial strategy.   Post-conviction counsel had ample opportunity to cross-examine trial counsel for purposes of determining whether their failure to object was the result of no strategy, or  to show the strategy was unreasonable, but failed to do so.  While this court cannot detect what, if any, testimony Mason could have proffered at the evidentiary hearing regarding these particular ineffectiveness claims that would have effected the outcome, nor does this court agree that

in all instances, a defendant's testimonial support of his ineffectiveness claim necessarily waives his Fifth Amendment right against self-incrimination, Mason is correct in his contention that the testimony of counsel or the defendant is not mandatory in support of all ineffectiveness claims. Notwithstanding that legal truism, this court cannot conclude that under the facts of this case Mason can begin to satisfy his burden by arguing there "cannot" be any reasonable strategy for counsel to fail to object to issues surrounding the confidential informant's statements. (*Id.* at 118). Nor can this court find that the state court's determination that Mason was not prejudiced by the comments or the prosecutor's argument is an unreasonable application of *Strickland* simply because Mason asserts that in his opinion the prejudice is "indisputable." (*Id.* at 118-119). It is in fact disputed. The Alabama Supreme Court said he was not prejudiced. He does not carry his burden merely by repeating that he thinks he was.

Mason next argues that "[like his argument concerning strategy and the confrontation clause/hearsay issues], defense counsel's failure to object to the prosecution's misstatements of law, improper bolstering of law enforcement testimony, unfounded allegations that Mr. Mason had tried to rape the victim and inflammatory statement that he intended to profit from the crime by writing a book, "cannot be considered reasonable trial strategy" and erroneously argues that the Alabama Supreme Court "already found that such conduct was improper." (*Id.* at 119)(citing 768 So.2d at 1011-13).

The Alabama Supreme Court did diverge from the Alabama Court of Criminal Appeals when the Supreme Court found three prosecutorial comments to be improper ( *i.e.* District Attorney Morgan's "dual function" argument, comments regarding fingerprint statistics, and argument concerning Detective Parker's experience taking statements and conviction success rate) because the

dual function argument was a misstatement of the law and the remaining were not supported by the evidence. (*Id.* at 1012-13). However, the Alabama Supreme Court nonetheless determined the improper statements were not so prejudicial as to rise to plain error. (*Id.*). The state supreme court did not mention the rape comment, and the book comment was never presented in any fashion to the state court.

Finally, Mason makes no effort to dispute the state court's rejection of his ineffectiveness claim pertaining to stipulations to certain evidence at trial.

For the foregoing reasons, this court finds that Mason has not shown that the state court's review of these claims is an unreasonable application of either prong of the *Strickland* standard or an unreasonable determination of the facts in light of the evidence before it. This claim is due to be denied.

## H. Petitioner's sentence of death is unconstitutional because it was sought and imposed pursuant to a pattern of racial bias in imposition of the death penalty. (Doc. 17, ¶¶ 165-168 at 72-73).

When Mason raised this claim in his Rule 32 petition, the post-conviction court held "this allegation is procedurally barred from review because it could have been but was not raised at trial because it was raised [sic] on appeal. Rules 32.2(a)(3) and (4), ARCrP. *Mason v. State*, 768 So.2d at 1008."[40] A review of the entire record on direct appeal and the page citation to the Alabama Court of Criminal Appeals' opinion shows that the Rule 32 court erred to the extent it found the above claim was raised and addressed on appeal.[41] In fact, Mason raised no semblance of this claim on

---

[40] (Rule 32 C.R. Vol. 16, Tab. 55 at 62-63).

[41] Thus, although respondent is incorrect in answering (doc 24) that the post-conviction court found the claim to be procedurally barred pursuant to ALA.R.CRIM.P. 32.2(a)(3) and (5), it is true that Mason failed to raise the claim at trial or on appeal.

direct appeal nor did the appellate court opinion address it.  The claim's appearance in the Rule 32 petition marked the first time it had been raised in state court proceedings.

Mason's collateral appeal from the rejection of the claim was dismissed as untimely filed by the Alabama Court of Criminal Appeals.[42]  Mason's failure to raise the claim at any stage of the state court direct appeal process as required pursuant to state procedural rules, together with his failure to timely appeal from the post-conviction court's dismissal of the claim, renders the issue procedurally barred from federal review.  It is due to be dismissed.

I.     **Imposition of death penalty in petitioner's case is disproportionate under State and Federal law.**  (Doc. 17, ¶¶ 169-171at 73-74).

In his petition, Mason alleges that by statute[43], "Alabama appellate courts must independently review whether the imposition of the death penalty constitutes a disproportionate penalty based on the crime, the defendant and in comparison to similar cases."  (Doc. 17 at 73-74).[44]  He then concludes, without illustration or explanation, that a sentence of death in his case is unconstitutional under the Eighth and Fourteenth Amendments because "other crimes for which the death penalty has been imposed [in Alabama]. . . involve a level of violence and cruelty that is far beyond" that exhibited in his case.  (*Id.*).

---

[42]     *Mason v. State*, Memorandum Opinion, CR-04-2394, ___ So.2d ___ (Ala. Crim. App. 2005).  (Rule 32 C.R. Vol. 16, Tab. 56).

[43]     ALA. CODE § 13A-5-53(b)(3).

[44]     In his petition, Mason also acknowledges that the Alabama Court of Criminal Appeals conducted such a review, but declares the Alabama Supreme Court failed to do so and, as such, his "constitutional right to due process" was violated.  (*Id.* at 74).  However, in his reply brief, Mason changes his position by conceding "the postconviction court found that the state supreme court had" conducted such an analysis "as well."  (Doc. 35 at 121).

In his reply brief, Mason again fails to provide support for his "other crimes" argument. (Doc. 35 at 121).  Instead, he alleges the state courts' "proportionality analysis" was "contrary to, or involved an unreasonable application of, clearly established federal law[,]" thus depriving him of due process.  (*Id.* at 121-22).  Mason supports this contention by repeating that the crime was not heinous, atrocious, or cruel.  (*Id.* at 121).  From this premise, Mason contends that no reasonable jury, judge, or appellate court would have upheld his death sentence based on the one remaining statutory aggravator (murder during the course of a robbery), the two statutory mitigators (being 19 at the time of the crime and having no criminal record), the evidence of his difficult childhood, and evidence his ineffective trial counsel purportedly failed to present *i.e.*, "sexual abuse as a child, that he was goaded into committing the crime by Quincy, that he was involuntarily intoxicated, and other mitigating evidence . . . not fully before the jury.") (*Id.* at 121).

The claim is without merit.  Mason's arguments regarding the HAC aggravator are without merit and his ineffective assistance of counsel claim as described above is  procedurally defaulted. (*See supra*, Claims D.5 and E.5).

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus filed by Derrick O'Neal Mason, along with his requests for discovery and an evidentiary hearing (docs. 17 and 35) are due to be **DENIED**.  A separate order shall be entered contemporaneously herewith.

**DONE** on this the 3rd day of March, 2009.

**VIRGINIA EMERSON HOPKINS**
United States District Judge